```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4             Plaintiff,             )
          vs.                         )
 5                                    ) CRIMINAL NO.:
     MATTHEW HIGHTOWER,               ) 1:23-cr-00186-SAG-1
 6                                    )
               Defendant.             )
 7   _____)

 8
                                       Baltimore, Maryland
 9                                     May 20, 2025

10
                         TRANSCRIPT OF PROCEEDINGS
11            MOTIONS HEARING and PRETRIAL CONFERENCE
              BEFORE THE HONORABLE STEPHANIE A. GALLAGHER
12                         Courtroom 7C

13
     For the Government:
14
          KIM Y. HAGAN, Esquire
15        PAUL E. BUDLOW, Esquire
            Office of the United States Attorney
16          36 South Charles Street, 4th Floor
            Baltimore, MD 21201
17

18   For the Defendant:

19        TERESA WHALEN, Esquire
            Law Office of Teresa Whalen
20          801 Wayne Ave, Suite 400
            Silver Spring, MD 20910
21
          DANIEL H. GOLDMAN, Esquire
22          The Law Office of Daniel Goldman, PLLC
            421 King Street, Suite 505
23          Alexandria, VA 22314

24

25        (Computer-aided transcription of stenotype notes)
```

1                    P R O C E E D I N G S

2          (10:04 a.m.)

3              THE COURT:  Good morning, everyone.  Please be

4     seated.

5              COUNSEL:  Good morning.

6              THE COURT:  Ms. Hagan, would you like to call the

7     case.

8              MS. HAGAN:  Yes, good morning, Your Honor.  Calling

9     United States versus Matthew Hightower.  This is 23-186.  Kim

10    Hagan and Paul Budlow on behalf of the Government.

11             THE COURT:  All right, good morning.  Good morning,

12    Ms. Whalen.

13             MS. WHALEN:  Good morning.  Teresa Whalen; I'm here

14    on behalf of Mr. Hightower.

15             MR. GOLDMAN:  Good morning, Your Honor.  Dan Goldman

16    on behalf of Mr. Hightower who's present.

17             THE COURT:  All right.  Good morning to all of you,

18    and good morning, Mr. Hightower.

19             THE DEFENDANT:  Good morning.

20             THE COURT:  Okay.  So we are here today for a

21    pretrial conference.  We have a number of things to go over on

22    my agenda, and then I'll see if the parties have anything else

23    we need to talk about.

24         The first thing is I think my clerk circulated yesterday

25    two documents.  One is the jury voir dire answer sheet, and the

1    other is the preliminary jury instructions that I prepared.

2    Starting maybe with the preliminary jury instructions, does

3    anyone have any objection to that form?

4              MS. HAGAN:  No objection from the Government, Your

5    Honor.

6              MR. GOLDMAN:  No objection from the defense, Your

7    Honor.

8              THE COURT:  All right, that was easy.

9        All right.  Next turning to the jury voir dire answer

10   sheet.  First let me go over my jury selection because I don't

11   think that any of you have selected a jury with me using this

12   method before.  Typically what I do -- actually the one thing I

13   have not yet done.  We have 75 jurors, I think, coming in for

14   this trial.  I think we can fit 75 people in here.  Do you

15   happen to know, Russell?

16             THE CLERK:  Might be pushing it but we'll --

17             THE COURT:  Probably going to be cutting it close.

18   What I typically do is I have the entire pool come into the

19   courtroom.  We hand out clipboards to each juror with this

20   written questionnaire on it.  They each have a pencil.  They

21   sit at their seats in the courtroom.  I read this aloud to them

22   as they go through, and they make checkmarks on the answer

23   sheet.

24       Then when they are finished reading the entirety, we

25   collect all of the clipboards and questionnaires.  We then

1   excuse all the jurors to generally the courtroom next door, and
2   we bring them in one at a time.  They sit in the jury box.  We
3   have a law clerk standing at the podium flipping through the
4   answer sheet, so you're seeing the answer sheet on your
5   screens.  They are flipping through, and I ask any follow-up
6   questions that would typically be asked with respect to the
7   questions on the answer sheet.
8       I do generally allow counsel very limited follow-up to
9   questions that I'm asking or if somebody has a question about
10  something on the demographic information or something like
11  that, we entertain limited follow-up from counsel as well.
12      Then once we finished questioning that particular juror,
13  they step back outside the courtroom.  I entertain any strikes
14  for cause or hardship from the parties, and I rule immediately
15  on that strike request.  That way we know if we add the person
16  to our list of qualified jurors or not.
17      Once we get to the number -- and we'll go over in a minute
18  what number we need.  Once we hit the number of qualified
19  jurors we need, we stop going through the answer sheets and
20  just select from the pool that we have.
21      Does anyone have any questions about the way I've
22  explained that or the process I would follow?
23          MS. HAGAN:  Not from the Government.
24          MS. WHALEN:  No, Your Honor.
25          THE COURT:  Okay.  All right.  I guess we then need

1    to think about how many jurors we need.  It's the summertime so

2    we probably have less issue with sickness, but things do tend

3    to come up in terms of other issues.  Have the parties talked

4    about how many alternates you think we would want in this

5    matter?

6            MS. HAGAN:  At least three, Your Honor, would be the

7    Government's suggestion.

8            THE COURT:  Ms. Whalen?

9            MS. WHALEN:  We think that's fine, Your Honor.

10           THE COURT:  Three?

11           MS. WHALEN:  Yes.

12           THE COURT:  Okay.  Russell says we would need 35 then

13   to be qualified jurors.  Does that sound right to everybody?

14   I'll give you a moment to work out the math.  Does that give

15   them each two for alternates?

16           THE CLERK:  Yes.

17           THE COURT:  That looks like 35 to me.  Does anyone

18   else have any issues with that?

19           MS. HAGAN:  No, Your Honor.

20           MS. WHALEN:  No.

21           THE COURT:  So we would question them until we got to

22   35 qualified jurors.  Again, I fear we'll lose some people in

23   terms of vacations and things of that nature, but hopefully we

24   can do okay.

25           All right.  Any issues there?  Mr. Budlow?

1          MR. BUDLOW:  Quick question.  When you're hearing

2    motions for strike for cause or particularly hardship, do you

3    typically hold off on some and move them to the bottom and wait

4    and see?

5          THE COURT:  I usually make a pretty quick decision on

6    cause.  Hardship I usually do put people -- sort of flag them

7    and wait until we get to the end and see how we're doing before

8    we make a decision on the hardship request.

9          MR. BUDLOW:  Great, thank you.

10         THE COURT:  Turning to the voir dire answer sheet

11   specifically, I use the parties' proposed voir dire that they

12   had submitted to prepare this.  Obviously, there were some

13   things that I either moved around or eliminated.

14      Does anyone want to put anything in particular on the

15   record with respect to things you may have included that I have

16   taken out or objections that you have to anything that I have

17   here?

18         MS. HAGAN:  Nothing from the Government, Your

19   Honor.

20         MS. WHALEN:  Court's indulgence one moment.

21         THE COURT:  Sure.

22         MR. GOLDMAN:  Nothing from the defense, Your Honor.

23         THE COURT:  Okay.  All right.  I think that is it in

24   terms of the preliminary instructions and voir dire unless

25   anyone can think of anything else?

1          MS. HAGAN:  No, Your Honor.

2          MS. WHALEN:  Your Honor, I think just number 2C with

3     the Wutoh murder and the healthcare fraud.  I just want to

4     preserve that that's obviously the subject of a 404(b) motion,

5     so there may be an objection to that.

6          THE COURT:  Okay, all right.  We can talk about that

7     in a moment when we get to the motions in limine and revisit it

8     if necessary.

9       Okay.  So I think we do have five motions in limine that

10    we need to discuss and I think, somewhat happily, some of these

11    motions in limine raise some issues that I think we're going to

12    need to work out in advance about how certain topics are going

13    to be addressed during the course of the trial.  It's a bit of

14    a complicated situation because the facts that the Government

15    intends to prove in this case do touch on other crimes that are

16    not specifically charged in this case which I think is the

17    topic of the first motion in limine which is the Motion in

18    Limine to Admit Intrinsic Evidence or in the Alternative 404(b)

19    Evidence.

20       I have reviewed the parties' submission on this point but

21    I'm happy to let anyone argue or add anything that they would

22    like to say.

23          MS. HAGAN:  Your Honor, unless the Court has any

24    additional questions on the Government's submissions, I would

25    just simply summarize that the nature of the evidence that the

1    Government intends to introduce outlined in our motion are

2    clearly intrinsic to the charges that Mr. Hightower faces and,

3    in the alternative, the evidence is admissible under 404(b)

4    because they are relevant and evidence of the planning, the

5    motive, the knowledge, preparation, and even in some instances

6    identity of the perpetrator.

7        For those reasons, Your Honor, the evidence is admissible

8    under 404(b).  The proffered evidence is relevant, necessary,

9    reliable.  And keeping in mind that the standard is not just

10   prejudicial evidence against Mr. Hightower but it has to be

11   unfairly prejudicial, and just using the case quoted by the

12   defense on the definition of unfair prejudice, the language

13   cited is that:  Evidence is unfairly prejudicial when there is

14   a genuine risk that the emotions of the jury will be excited to

15   "irrational behavior."  None of the proposed other acts that

16   the Government seeks to introduce against Mr. Hightower fall

17   within that category, Your Honor.

18       So for those reasons, we'd ask the Court to hold that the

19   proffered evidence is intrinsic to the crimes charged and then,

20   in the alternative, admissible under 404(b).

21           THE COURT:  Let me ask just a couple of questions.

22   One that I don't have complete understanding of, what is the

23   connection between the healthcare fraud scheme and the

24   extortion Wutoh murder?  It seems to me that they're sort of

25   two different things, and obviously the Wutoh murder is more

1    directly implicated by the facts that we're talking about

2    here.

3              MS. HAGAN:  The healthcare fraud scheme investigation

4    and the David Wutoh murder investigation are linked by the

5    witness, the intended victim.  The healthcare fraud scheme,

6    Your Honor, was the very beginning of this story.  It all began

7    with that initial phone call by the intended victim to a

8    federal agency on the hotline to report it, and that sparked

9    the entire federal investigation.  So that was the initial

10   focus of law enforcement was investigating the healthcare fraud

11   that was occurring at this company, RXRS, where Mr. Hightower

12   worked.  During the course of that investigation, Mr. Wutoh was

13   murdered in September of 2013, early stages of this

14   investigation, and the intended victim provided information in

15   that investigation as well.

16        So there came a point in time where Mr. Hightower is now

17   being investigated for two different offenses, both providing

18   motive because he's learning that the same person is providing

19   information on both of these investigations.

20             THE COURT:  Do you have evidence that he had received

21   information that the same person had provided healthcare-

22   related information as well?

23             MS. HAGAN:  Yes, Your Honor.  In fact, for example,

24   one of the categories of evidence that established

25   Mr. Hightower's knowledge are his own recorded calls.  At the

1    jail he is speaking to a witness who is incarcerated at the

2    time, and Mr. Hightower is complaining about the intended

3    victim and how essentially she reported this alleged fraud

4    happening at the company.  His discussions about the intended

5    victim are on multiple recorded calls over a period of time,

6    including much later in the investigation where it's clear that

7    he's complaining about the intended victim and how she was the

8    start of this entire thing.

9           Additionally, Your Honor, there will be testimony that

10   discovery was provided to Mr. Hightower's attorney after he was

11   indicted on the healthcare fraud investigation and that early

12   on in that discovery process, a memorandum written by a

13   detective summarizing his witness interviews included

14   information from the intended victim about what she told law

15   enforcement not only on the healthcare fraud investigation but

16   also on the David Wutoh murder.  So --

17          THE COURT:  Did that memo identify the intended

18   victim?

19          MS. HAGAN:  Yes, yes.  And there will be witness

20   testimony that Mr. Hightower knew, believed that it was the

21   intended victim that had started both the investigations.

22   So although factually the two investigations are not related to

23   one another, really the only fact that might be in common aside

24   from the fact the intended victim provided information on both

25   and establishes the motive is that David Wutoh was a friend and

1    associate of Harry Crawford who is one of the owners of RXRS,

2    and that is the connection between Mr. Hightower and David

3    Wutoh.

4              THE COURT:  All right.  Let me ask you this and this

5    may be a difficult question to answer in a sort of summary

6    fashion.  Assume for a moment that I agree with you that a lot

7    of these things are essentially intrinsic to the charged crimes

8    and what the Government needs to prove, I think there is

9    probably a line that can be crossed to the point where we're

10   getting too into the weeds in terms of some of these other

11   offenses.  On a basic level, the fact that the victim reported

12   the healthcare fraud and the fact that the victim reported the

13   Wutoh murder and that Mr. Hightower, in your view, knew those

14   things, that seems to be relevant to the case here.  Getting

15   into the details of the healthcare fraud that was being

16   committed or the details of Mr. Wutoh's murder, some of those

17   things do not appear to me to be intrinsic to this offense.

18        Are you able to proffer in any sort of summary way how you

19   intend to touch on these things?  I guess the same thing with

20   respect to the drug trafficking activities; right?

21              MS. HAGAN:  Yes.

22              THE COURT:  To the extent that the Government

23   believes it has evidence that the payment for the murder for

24   hire that it is charging involved turning over a drug source

25   and customer list and earnings and possibly some drugs, that is

1  | all intrinsic to this crime.  Getting into great detail about a

2  | history of drug dealing is not as much.

3  |            MS. HAGAN:  Yes.

4  |            THE COURT:  Can you give me some sense of your intent

5  | with respect to handling of those things.

6  |            MS. HAGAN:  With respect to the healthcare fraud

7  | investigation, essentially I can summarize that it can be

8  | presented two ways.  One, in the recorded jail calls,

9  | Mr. Hightower himself details what the allegations are with

10 | respect to the alleged fraud occurring at RXRS, and

11 | specifically with his own allegations, Mr. Hightower and other

12 | witnesses can say that the allegations were that he was signing

13 | delivery tickets or falsifying delivery tickets of medical

14 | supplies that were not delivered.  That's essentially what he's

15 | learning that the intended victim had reported, that generally

16 | that was the nature of the fraud:  The company is billing

17 | Medicaid for medical supplies that weren't delivered, it's a

18 | small company, and Mr. Hightower was the delivery person.

19 |       Additionally there will be witness testimony that that

20 | was -- in addition to the calls from Mr. Hightower, witness

21 | testimony that that was the sum and substance of the healthcare

22 | fraud allegation.

23 |            THE COURT:  I guess -- the allegation made by the

24 | victim?

25 |            MS. HAGAN:  And that's what the Government eventually

1   charged Mr. Hightower and others with, healthcare fraud arising

2   out of billing the government for supplies not delivered.

3           THE COURT:  Okay.  What about with respect to the

4   Wutoh murder, how much did you intend to get into that?

5           MS. HAGAN:  The most efficient way to establish

6   Mr. Hightower's involvement in that would be to introduce the

7   fact of his conviction, Your Honor.  Also relevant because the

8   strength of that case against him or the strength against the

9   healthcare fraud case against him is relevant to the strength

10  of his motive and the degree of his motive to want to get rid

11  of the primary witness against him.  So certainly the most

12  efficient way would be to introduce a certified copy of his

13  conviction.

14      Additionally, Your Honor, Detective Sekou Hinton, who was

15  the primary investigator from the Baltimore County Police

16  Department, can summarize the basic facts of the initial

17  homicide, the crime scene, the fact that Mr. Wutoh was shot,

18  the date and time of his murder.  Mr. Hightower himself

19  discusses the investigation over jail calls.  In particular, he

20  discusses on more than one occasion over the calls and with

21  witnesses the fact that the government has a cell tower hit

22  placing him near Mr. Wutoh's residence.

23      Additionally, Your Honor, there would be witness testimony

24  about Mr. Hightower's statements about his involvement in the

25  Wutoh murder.

1     So although we don't need to delve into every detail and

2 retry Mr. Hightower for the extortion murder case, there are

3 ways that the Government can introduce so the jury can -- we

4 can establish for the jury a strength of that case against him

5 which then increases his motive to want to murder.

6           THE COURT:  When you say the strength which increases

7 his motive, you're suggesting that the evidence was not

8 overly -- obviously he was eventually convicted, but you're

9 suggesting that the intended victim was a very critical piece

10 of the murder case?  Is that what you're saying?

11           MS. HAGAN:  Yes.  And also what I mean, Your Honor,

12 is that, for example, I know in the defense's response, their

13 hope is that the Court would require the Government to present

14 the most limited story to the jury and simply have the

15 Government present evidence that Mr. Hightower was charged with

16 an offense, that there was a witness that had information

17 against him and that because he was charged with that offense,

18 he faced jail time.  The most limited version of facts that

19 completely provides no context whatsoever.

20     The problem with that, Your Honor, is, for example, if I

21 were charged with a crime, whether it was grand theft auto or

22 robbery, if I thought that I were innocently -- incorrectly

23 being charged with a crime, I knew I was innocent but I learned

24 who the witnesses were against me, my motive to get rid of one

25 of those witnesses is not going to be as strong as if I

1    actually committed the crime, I knew the Government's case was

2    getting stronger, I became aware of who these witnesses are.

3    The motive to kill is much higher and greater knowing that I

4    actually committed the crime.

5          So that's the distinction the Government makes when I talk

6    about the strength of the crime, how it's related to the

7    strength of the motive; the degree of the motive is much

8    stronger knowing that Mr. Hightower did, in fact, commit the

9    crime against Mr. Wutoh.

10              THE COURT:  Okay.  Why don't you touch briefly on the

11   drug trafficking activities.

12              MS. HAGAN:  Yes, Your Honor.  The drug trafficking

13   activity is relevant for two reasons.  One, it establishes the

14   element of procurement and payment.  Mr. Hightower is charged

15   with murder for hire.  There will be testimony that that was

16   the intended method of payment to the shooter of Ms. Ashburne.

17   Additionally --

18              THE COURT:  Meaning turning over the source and

19   customer list and earnings?

20              MS. HAGAN:  Yes, Your Honor.  And that breakdown will

21   be further explained at trial as to how the numbers were to add

22   up to an amount that was to be paid to the shooter.

23         Additionally it establishes why Mr. Hightower was

24   comfortable approaching the shooter as a co-conspirator and

25   engaging in the planning of a murder plot and how he intended

1   to pay the shooter.  So it is once again an inextricably

2   intertwined part of the story and provides context to the

3   testimony that the jury will hear from the co-conspirator and

4   shooter of Ms. Ashburne.

5            THE COURT:  Okay.  I think I understand your

6   position.

7            MS. HAGAN:  Thank you.

8            THE COURT:  Mr. Goldman, Ms. Whalen?

9            MR. GOLDMAN:  Thank you, Your Honor.  We'll largely

10  rest on our pleadings here but just to clarify a couple points

11  based on what the Government just said.  It's our position that

12  these prior crimes are really just sort of piling on

13  Mr. Hightower and that much of this is not necessary for the

14  Government to prove its motive.  What's sufficient is to say

15  that he was facing -- he was charged with crimes, he was facing

16  serious time, evidence was substantial against him, and that

17  there was a key witness -- and that the victim was a key

18  witness against him.  That some sort of more sanitized version

19  of that prevents us from having to effectively go through

20  retrying the allegations in these prior cases because to the

21  extent that the Government is going to put on the evidence that

22  it just described, we need to be able to -- he has a due

23  process right to challenge that evidence.  It's being used to

24  prove his guilt in this case.

25       We need to be able to challenge those underlying events,

1    and obviously we have different characterizations and different

2    types of views of some of that evidence and the strength of

3    that evidence.

4          I would note that in terms of the Wutoh case, the

5    Government has listed obviously the conviction.  The conviction

6    is enormously prejudicial for the jury to know that he's been

7    previously convicted of a murder.  And it's our position that

8    that's just going to -- that's sort of going to end the game

9    for them.  Once they know he's been previously convicted of a

10   murder, they're going to be much more primed to believe that

11   he's the type of person who would commit a murder here.

12             THE COURT:  Let me turn to Ms. Hagan for a moment.

13   Why does the Government believe that the conviction here is

14   relevant?

15             MS. HAGAN:  It's relevant -- just on the topic that

16   we were just discussing, Your Honor.  Again, the strength of

17   the evidence against Mr. Hightower.

18             THE COURT:  But wouldn't the strength of the evidence

19   against Mr. Hightower be -- what would be relevant about it

20   would be his perception of the strength of the evidence at the

21   time when he made the decision to allegedly have the witness

22   murdered; right?  Not so much the eventual disposition of the

23   murder case?

24             MS. HAGAN:  Not the disposition but the fact that he

25   did it.  So in the example I gave, the fact that I know that I

1    committed that robbery, and there's witnesses against me and

2    I'm finding out who they are, that makes me want to get rid of

3    the witnesses more than if I'm innocent and had nothing to do

4    with the case.

5          So the fact that he was, in fact, guilty, that he did

6    kill -- maybe that's the more articulate way for me to say it.

7    The fact that he did, in fact, kill David Wutoh is highly

8    probative to his desire and motive to kill the witness against

9    him.

10          THE COURT:  All right, Mr. Goldman.

11          MR. GOLDMAN:  Our position is that conviction itself

12   is not a fair stand-in for whether he actually did it or not.

13   Obviously a jury found -- based on the evidence that was

14   presented under the circumstances of that previous trial, they

15   did make that finding but that's not necessarily a fair

16   standard.  There are a lot of reasons why someone might be

17   convicted without having committed the underlying offense

18   necessarily.  And if we get into that, then I think we have

19   to -- we're going to have to be able to get much further into

20   the evidence of that case and litigate a lot of points along

21   the way.

22          As to sort of the importance of the victim, I'll note that

23   the Government stated they want to put in the conviction, they

24   want to put in a summary from Detective Hinton, jail calls from

25   our client and other witness testimony about statements that

1   he's made.  That's a lot of evidence right there that they can

2   sort of work with and pick from there.  But it also didn't

3   include anything from the victim herself in those categories of

4   evidence.

5        So I don't know that she -- I don't know that the

6   victim -- how important, how integral she was to the case

7   against him I think is up for debate.  Obviously if we start

8   going down that road, then there's going to be -- it makes the

9   trial substantially more complicated and substantially longer

10  to have to go through all of those witnesses to prove up the

11  prior murder as well as the healthcare fraud conspiracy as

12  well.  That case ultimately was dropped against him.  He wasn't

13  ultimately convicted in that case.

14            THE COURT:  Right.  Let me ask you this.  I see the

15  Government's point, particularly if there are jail calls with

16  your client's statement regarding the fact that this witness,

17  the prospective witness is the one who reported the healthcare

18  fraud offenses and the one who wasn't a witness that was going

19  to testify in this murder.  That all seems to me to be clearly

20  integral to what the Government is trying to prove in this

21  case.  Do you agree to that extent?

22            MR. GOLDMAN:  I would generally agree.  I would

23  disagree with the characterization of the actual content of

24  those calls.  I think that what he's saying on those calls

25  doesn't necessarily support that he wants to get rid of her by

1    any means.

2              THE COURT:  Okay.  All right.

3              MR. GOLDMAN:  As far as the drug trafficking goes,

4    that seems to be really a step too far.  They can establish

5    that our client trusted the shooter because there are multiple

6    people who say they were very close friends.  I think the

7    shooter himself will say he would call him his best friend, he

8    would call Mr. Hightower his best friend.  So they have a long,

9    long relationship.  The fact of the drug trafficking

10   relationship is really just another way to sort of impugn his

11   character and credibility.

12        In terms of the actual payment itself, the Government has

13   a sum that they've determined is what the payment was, and I

14   believe that's what the shooter will ultimately say that's what

15   the sum is.  And it is comprised of drug proceeds and drugs

16   themselves, but I think just the amount of the payment itself

17   would be sufficient.  I think we can come to some kind of

18   agreement to sanitize much of this and say this is what the

19   jury is going to be told about these prior cases and avoid

20   having to go through a whole lot of litigation, a whole lot of

21   witnesses who are going to prove it all up.

22             THE COURT:  Let me say with respect to all of this, I

23   certainly encourage the parties to talk about if there are ways

24   to stipulate to some of these things to make things (a) more

25   palatable for the defense and (b) more streamlined in terms of

1    the presentation to the jury.  Any rulings I make today

2    certainly doesn't foreclose anyone from trying to reach those

3    sorts of agreements, and I certainly encourage both sides to do

4    that.

5              MR. GOLDMAN:  Well, we've had some communications

6    about these kinds of things.  I think we probably don't agree

7    on the substance of that stipulation, but maybe there's

8    something we can come to to try to limit some of this stuff.

9              THE COURT:  Okay, all right.  Unless anyone has

10   anything else to say, let me say a few things.

11        First of all, I believe that most of this is intrinsic and

12   so I am going to allow most of what we've talked about today.

13   I do not see that the conviction itself is relevant.  I think

14   that would be more prejudicial than it would be probative.  I

15   think the critical part of all of this is Mr. Hightower's

16   understanding at the time in which the murder of the intended

17   witness was contemplated of the role of the prospective witness

18   and what she had reported and what she was going to do in

19   upcoming proceedings.

20        But I don't think this can be sanitized any further or

21   couched as just reported about certain crimes or anything like

22   that.  I do take the Government's point that I think the nature

23   of these offenses, the nature of the crimes being alleged is

24   important in understanding the motivation that Mr. Hightower

25   might have to take action against the prospective witness.

1          So I don't -- I am not going to require further sanitation

2    of the healthcare fraud offenses or the Wutoh murder.  Let me

3    say particularly with respect to the Wutoh murder though, I

4    expect the Government to be restrained in terms of retrying --

5    we're not retrying the murder, we're not trying for the first

6    time the healthcare charges.  We're not going to be trying to

7    prove that he did these things.

8          The importance is he was charged with these things, what

9    is his understanding of what the case against him looked like,

10   what is his understanding of the role that the prospective

11   witness was going to play both in bringing us to the point that

12   they were at and in what he was going to do -- what the witness

13   was going to do at upcoming court proceedings.  So I want the

14   focus to stay there and not to be on the evidence that he

15   committed the Wutoh murder and all of that, and I certainly

16   don't want to get to retrials on any of this.  Again, I'm going

17   to exclude the conviction itself.

18         With respect to the drug trafficking though, I do believe

19   that it is fair game in terms of the nature of the payment that

20   was provided and also the relationship between the two.

21   Obviously while one might trust a friend to engage in this kind

22   of activity, one would be more comfortable approaching someone

23   who already had been involved in criminal activity together if

24   they were looking for someone to approach about committing

25   another crime.  So I think that all of that is also intrinsic

1  to what the Government is trying to prove in this case.

2      Once again, that doesn't mean that I'm looking for

3  extensive information on how long have they been drug dealing,

4  how many drugs have been sold and things of that nature.  I

5  want this presented in as streamlined a way as possible, but I

6  do think that the precise nature of the payment is fair game

7  and the fact that they had a previous relationship that

8  involved engaging in criminal activity is also fair game.  So

9  while I will certainly entertain reasonable objections as we go

10 along in terms of they're going too far down the path, I want

11 to be cognizant of that, but I think that the nature of these

12 things is fair.

13     So I guess to the extent I'm ruling on this, I guess I'm

14 granting in part and denying in part the motion in limine to

15 admit extrinsic evidence, excluding really the conviction

16 itself.

17     Does anyone have any questions about that ruling?

18         MS. HAGAN:  No, Your Honor.  Thank you.

19         MR. GOLDMAN:  No, Your Honor.

20         THE COURT:  Okay, all right.  The next is a sealed

21 motion and since we have a number of persons in the back of the

22 courtroom, maybe we'll save that one until the end.

23         MR. BUDLOW:  Your Honor, I can tell you who I see in

24 the courtroom other than CSO are members of the prosecution

25 team and another assistant U.S. attorney.

1           THE COURT:  Oh, okay.

2           MR. BUDLOW:  From our perspective, we're willing to

3   go forward.

4           THE COURT:  All right.  Does anyone mind if we go

5   under seal at this point and --

6           MS. WHALEN:  No, Your Honor.

7           THE COURT:  -- discuss No. 95 -- 94 which is the

8   Motion in Limine to Admit 404(b) Evidence.

9       **(Portion held on the sealed record.)**

10      (Page 24, lines 10-25, through page 45, lines 1-3, are

11  filed under seal.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Lines 1-3 intentionally left blank.)

2

3

4    **(The following was held in open court:)**

5        THE COURT:  So that is 94 which, again, is granted in

6    part and denied in part.

7        Now we move on to 95 which is a motion in limine to admit

8    certain exhibits and argument, a lot pertaining to the prior

9    trial.  This goes to one question that I do have for the

10   Government which is it doesn't seem to me in this case that

11   it's really contested that Carter and Mosley committed the

12   shooting?  Is that contested and to the extent it's not, how

13   much are we going to need to get into the evidence of their

14   commission of the shooting?

15       I'm talking about the two summary exhibits from the Carter

16   and Mosley trial.  Summary chart with cell phone records.

17       MR. BUDLOW:  I don't know what the defense's position

18   on that.  Mr. Carter is going to testify.  He's going to say

19   Mosley was with him, was part of this, was the driver.

20       This summary exhibit does include corroborating

21   information such as their various phone activity,

22   communications the night before, location activity, and the

23   Government does intend to continue to put that forward as part

24   of corroborating the testimony of Mr. Carter and proving the

25   case generally.  I don't know if that answers the Court's

1    question.

2              THE COURT:  It may.  Does the defense want to speak

3    to any of this?

4              MR. GOLDMAN:  I don't think that we can agree at this

5    point that we wouldn't contest the underlying facts of Carter

6    and Mosley's participation in this.

7              THE COURT:  Okay.

8              MR. GOLDMAN:  As to the summary charts, summary

9    exhibits, I think we don't object to the use of summary

10   exhibits provided the underlying data, we have it and that it

11   matches up to the underlying evidence that is otherwise

12   admissible.

13             THE COURT:  All right.  I think you had said that in

14   your motion.  I wanted to make sure that I understood sort of

15   why we were heading down that path.

16             MR. BUDLOW:  Sure.  I understand that since it came

17   from the other trial, some of it overlaps.

18             THE COURT:  Yes, I want to make sure we're not

19   completely retrying Carter and Mosley's responsibility,

20   although it sounds like if it's not conceded, we may need to

21   get into it to some --

22             MR. BUDLOW:  To some extent, I think.  With respect

23   to the motion and the defendant's response as to most of 95 and

24   103, we've met with counsel telephonically last week and really

25   worked through a lot of these.

1      THE COURT:  Okay.  Why don't you tell me then what we
2  still need to talk about.
3      MR. BUDLOW:  Sure.  I'll just tell the Court with
4  respect to the summaries, there's a video summary that's been
5  provided.  There's a phone, location summary that involves
6  calls and texts, that's P2.  That's been provided.  I think the
7  defense is going to get back to us if there's things they think
8  need to be included or they have an issue with.  I don't
9  believe we need to address them today.
10     There's a lot of cell phone records.  We've discussed with
11  the defense the need to provide, let's just say, accurate and
12  compliant certifications for those records.  I think that we're
13  in the process of doing that and consulting with them.  I don't
14  think we need to address that today unless the Court thinks
15  otherwise.
16      THE COURT:  Is this in 96, the business records?
17      MR. BUDLOW:  These are all in 95.
18      THE COURT:  Okay.
19      MR. BUDLOW:  That leaves the Government's motion in
20  limine in 95 relating to precluding the defense from arguing
21  that the comparative weight of the evidence in this trial was
22  different from another trial or that the Government had a view
23  of the evidence at one point in time or that defendants were
24  charged or not charged, everything relating to that, which I'm
25  happy to discuss if the Court wants to hear from the Government

1    first or would prefer to hear from the defense first.

2            THE COURT:  I'd probably hear from the defense first.

3    Did you say you've resolved the part about the penalties?

4            MR. BUDLOW:  I didn't say that but I think we have.

5            THE COURT:  Okay.

6            MR. BUDLOW:  I'll just sort of front that for the

7    Court because it could seem different when we do it at trial.

8    Defense's view is that what they have expressed is they don't

9    plan on arguing anything about penalties relating to

10   Mr. Hightower in front of the jury, referencing it in their

11   questions.  They do expect to have the ability to cross-examine

12   a cooperator such as Mr. Carter who is facing significant --

13   has already been sentenced to significant time.  We agree with

14   that, and so I don't think we have any issue there.

15           THE COURT:  Okay.

16           MR. GOLDMAN:  We largely agree on that.  We presume

17   that the jury will likely make the inference that the penalties

18   are the same, but we're not going to argue it as to

19   Mr. Hightower.

20           THE COURT:  They'll be subject to the standard

21   instruction that they are not to consider punishment.  Again, I

22   think in every case you instruct them, and you hope they follow

23   it and presume they follow it so we'll do that.

24           MR. GOLDMAN:  Okay.  As for the relative -- the issue

25   of the relative strength of the prior trial, we're certainly

1    not going to argue anything about the Government's belief or

2    their opinions or certainly any communications that we've had

3    with them about any beliefs that they had about the relative

4    strength of the case at that time.  But I do think it is fair

5    for us to be able to argue -- certainly if Mr. Hightower was

6    not charged in the initial indictment, in the initial trial of

7    Carter and Mosley, he wasn't their -- was not evidence

8    sufficient to bring charges against him until these cooperators

9    came forward.

10           THE COURT:  But what evidence do you have that there

11   was not sufficient evidence to bring charges?  We know that

12   they did not bring charges, but how would that not be based on

13   the Government's belief or opinions which may or may not have

14   been there?  It may be that there was some other reason that

15   the Government decided not to bring charges at that point in

16   time.

17           MR. GOLDMAN:  I think at the very least, we need to

18   be able to argue that Mr. Hightower was not charged with these

19   until evidence of these two cooperators came forward.  I think

20   the Government's belief about why they didn't charge it

21   earlier, I agree I'm not -- we won't get into their

22   prosecutorial choice at that point.  But at the same time, I

23   think it's fair for the jury to draw an inference from the fact

24   that he wasn't charged previously, and charges were not brought

25   against him until Davon Carter and CW-1 provided additional

1    information and different information than what the Government

2    had previously.

3         Whether they had enough to charge before and didn't, I

4    think that's -- maybe that's out of bounds.  But to the extent

5    that the charges weren't brought until these people came

6    forward, I think that's fair argument, and he has a right to

7    present a defense on those points, that these are the witnesses

8    and if a jury -- we're certainly going to be arguing that the

9    jury shouldn't believe these two witnesses and there are a lot

10   of reasons why we'll be arguing why they shouldn't believe

11   those witnesses.  Without that evidence, then he couldn't be

12   convicted.

13            THE COURT:  So as I understand it now, you're not

14   going to be arguing that the Government had a stronger case

15   against Carter and Mosley or that the Government made charging

16   decisions for a particular reason.  You're just going to be

17   arguing that he was not charged until the two cooperators came

18   forward.

19            MR. GOLDMAN:  I think that the strength of the

20   evidence against Carter, I think we will argue that the

21   evidence against Carter is substantially stronger but the

22   timing issue --

23            THE COURT:  How is that relevant?  The jury is being

24   asked to decide one thing which is whether the Government has

25   produced sufficient evidence to prove Mr. Hightower guilty.

1  What does how much evidence they might have had against someone

2  else have to do with that?

3          MR. GOLDMAN:  Well, it goes to the -- I think it goes

4  to the issue of Mr. Carter's credibility in and of itself.

5  We're going to be -- the big part of this case is going to be

6  questioning Mr. Carter's credibility, and the fact that he went

7  to trial and was not -- was maintaining his innocence for all

8  that time.  It wasn't until there was a benefit to him down the

9  road that he changed his mind and provided this information

10 once he already had a life sentence.  I think it clearly goes

11 to his credibility as a witness in this case.

12         THE COURT:  That part may go to his credibility but

13 what does the relative strength of the evidence have to do with

14 any of it?  I understand that he has been convicted of

15 something, he received a life sentence and now he's coming in

16 to cooperate, and that certainly gives you to grounds to try to

17 impeach his testimony.  But I don't understand why comparing

18 the strength of evidence against one person versus the strength

19 of another, I don't understand the relevance of that.

20         MR. GOLDMAN:  I suppose that's fair.  We won't argue

21 itself in...

22         MS. WHALEN:  Court's indulgence.

23         THE COURT:  Sure.

24         MR. GOLDMAN:  I think it goes to the point of what --

25 it gives a jury an opportunity to look at what a reasonable

1    doubt looks like and to be able to argue that:  This is the

2    evidence they had against Mr. Carter, this is what they

3    presented against Mr. Carter.  And at this point in time, you

4    don't have that evidence against Mr. Hightower.

5            THE COURT:  All right.  I will say that I'm not

6    inclined to go with that argument.  Let me let Mr. Budlow

7    respond to --

8            MR. BUDLOW:  Thank you, Your Honor.  I appreciate at

9    least they're saying it out loud, saying the grossly, patently

10   inappropriate part out loud which is that you can't consider

11   evidence against somebody else when considering the guilt or

12   innocence of this defendant.  It's beyond question -- first of

13   all, defense cites no cases for the position that they can

14   introduce evidence or ask questions or make arguments that are

15   expressly prohibited.  It's beyond question the jury should

16   only consider the evidence in this trial.  The jury cannot base

17   their evidence on evidence from the trial of a co-defendant.

18   The jury can never draw any inference from who is or who is not

19   charged, not prior to trial, not even at trial and not later.

20       It's beyond question that the guilt of others is never a

21   proper consideration.  And even in trials when there are

22   co-defendants, the jury is instructed to consider each

23   defendant separately and the evidence against each separately.

24   That is expressly what the defense asks you to do.

25       The Court asked:  Are you just going to argue that they

1   weren't charged until the two cooperators came forward?  That

2   should never be allowed.  They shouldn't get to know who was

3   charged in a prior trial.  They shouldn't get to know when

4   charges were filed against other individuals --

5          THE COURT:  They will know about Mr. Carter, though,

6   because he's going to testify and so --

7          MR. BUDLOW:  That's right.  And the jury should be

8   told not to speculate about who else may or may not have been

9   on trial at that time.  What, for example, if everyone was

10  charged in that case and there were hung juries against the

11  other two defendants?  We would never let the jury know who was

12  also tried in that case if it was necessary here to say:  At

13  the prior trial, didn't you testify to this or at the prior

14  trial, didn't something happen?  We would keep out that there

15  were anybody else charged.

16      I think just looking right at the jury instructions makes

17  all of these points clear, both the ones that we submitted and

18  some others.  For example, we submitted a pattern instruction

19  that's a combination of 2-18 and 3-4 which was Jury

20  Instruction 9.  The defense discusses 3-4 in their argument,

21  but I think they misread it or read only the part that doesn't

22  apply here.  3-4 says, "You may not draw any inference,

23  favorable or unfavorable, towards the Government or the

24  defendants on trial from the fact that certain persons were not

25  named as defendants in the indictment."

1      It couldn't be more clear than that.  "The circumstances

2   that these persons were not indicted must play no part in your

3   deliberations."  In the comments says, "When there are claims

4   that persons other than the defendants on trial participated in

5   the crime charged, it's appropriate for the Court to instruct

6   the jury to disregard the fact that others were not also

7   indicted except insofar as the fact may bear on the credibility

8   of unindicted accomplices who testify.  This is especially so

9   when the defense counsel attempts to claim discriminatory

10  prosecution as a defense to the jury."  So it's clear that this

11  idea that you can say who was and wasn't in charge and when

12  isn't allowed.

13      Additionally in Instruction 3-5 -- this was not requested

14  because it applies to co-defendants, but I think it's

15  instructive.  This is consider each defendant separately.  The

16  Court would instruct the jury "Your verdict as to each

17  defendant must be determined separately with respect to him,

18  solely on the evidence or lack of evidence presented against

19  him without regard to the guilt or innocence of anyone else."

20      Additionally, Jury Instruction 3-7 also relating to

21  co-defendants so not provided here but instructive.  "Bear in

22  mind that guilt is personal and individual.  Your verdict must

23  be based solely upon the evidence about each defendant.  The

24  case against each defendant stands or falls upon the proof or

25  lack of proof against the defendant alone, and your verdict as

1   to any defendant should not influence your decision as to any

2   other defendant."

3       Finally, the instruction that we provided that also

4   included -- I'm sorry, Instruction 2-18 which we merged with

5   3-4.  2-18, the very first line, says "As a general rule the

6   jury, in reaching its verdict, should consider only whether the

7   guilt of the defendant on trial has been proven.  The guilt of

8   others is not a proper consideration."

9       So when the defense says that we think the fact that the

10  defendant here wasn't charged until the two cooperators came

11  forward and that -- my initial thought is why is that relevant?

12  The defense says:  And the jury should be free to draw any

13  inferences from that.

14      The inferences that they are suggesting that they would

15  either want to leave hanging and not argue or argue is exactly

16  all of these inappropriate considerations that the instructions

17  that the Court gives in every case are designed to prevent,

18  which is that the jury should think about things relating to

19  charging and the weight of evidence and the guilt of others

20  that are outside of this courtroom, that aren't about the

21  evidence in this courtroom, and consider them in determining

22  whether or not the defendant in this trial has been proven

23  guilty beyond a reasonable doubt, a standard that isn't

24  defined.  So they shouldn't be able to add evidence to help

25  define that standard any better.

1      The fact that a case can be sufficient for beyond a
2  reasonable doubt with one quantum of evidence doesn't mean that
3  it also can't be found to be guilty beyond a reasonable doubt
4  with a lesser quantum of evidence.  That's precisely the reason
5  or one of the reasons why the Fourth Circuit doesn't allow
6  defendants to attempt to define reasonable doubt.  In bringing
7  in these outside considerations, there's no inference proposed
8  other than an inappropriate inference to say that the evidence
9  is weaker here or the Government had a different position here
10  or that the Government is relying solely on the evidence of
11  cooperator and that the jury, therefore, if they don't believe
12  the cooperator, shouldn't be able to consider all of the other
13  evidence in reaching the beyond-a-reasonable-doubt decision.
14      They can argue that separately, they just can't use the
15  fact who was arrested when to try to tell the jury that there's
16  somebody else decided that that wasn't sufficient.
17          THE COURT:  Okay, thank you.  Anything further,
18  Mr. Goldman?
19          MR. GOLDMAN:  I would just say briefly on the jury
20  instructions related to co-the defendants, I think those are
21  meant to deal with the particular prejudice of people being
22  tried together at the same table in the same courtroom.  So I
23  think those particular instructions aren't relevant to this
24  particular motion.  But I do think that -- I think the point is
25  taken that the comparing this case to Mr. Carter's case may be

1    outside of the bounds, but to the extent that we can argue

2    about the facts in each of those cases, certainly I think

3    that's within the scope of our defense.

4            THE COURT:  Okay.  All right.  I generally agree with

5    the Government on most of what Mr. Budlow just said.  I don't

6    think that the evidence at one trial can be used comparatively

7    either to draw a reasonable doubt standard or to argue the

8    sufficiency of the evidence in this case.  In a bank robbery

9    case, you might have one person who's caught red-handed and

10   confessed to the crime and another person in which there's only

11   circumstantial evidence, but the evidence may be sufficient to

12   find guilt beyond a reasonable doubt in both kinds of cases.

13   And allowing the facts of one case to be brought in in another

14   case, it just doesn't make sense.  It's not the way things

15   work.

16        The jury is supposed to make a decision based on the

17   evidence that is presented to it in court and whether the

18   Government has met the standard of proving guilt beyond a

19   reasonable doubt.

20        I also think there's a great deal of danger whether either

21   expressly or by inference getting into the reason for

22   Government's charging decisions and what evidence sort of

23   tipped the scale in favor of the Government making a charging

24   decision or not.  I understand that he was not charged until

25   these two cooperators came forward, but it doesn't mean that

1  was the reason for the timing of the Government's decision and

2  I don't think that it's appropriate to allow the jury to

3  speculate about those things.

4      So I am going to grant the motion to exclude references to

5  the relative strength of the prior trial.  While we're not

6  specifically talking about jury instructions right now, I'm

7  inclined to stay with the standard instructions in terms of the

8  fact that you consider the evidence presented against this

9  defendant at this trial.  Clearly, we're not going to be

10 getting into all of the instructions that Mr. Budlow talked

11 about today that no one is requesting, but generally I don't

12 see a reason to draw distinctions between this case and other

13 cases in terms of the instructions that will be given to the

14 jury.

15     Is there anything I need to clarify about that ruling?

16     MR. BUDLOW:  Your Honor, I would ask the Court to

17 also rule that the defendant is precluded from eliciting

18 testimony relating to that Mr. Hightower wasn't charged earlier

19 and that he was only charged after the two cooperators came

20 forward -- that's what the defense claims -- or anything

21 adjacent to that.  I'm not sure how many different ways they

22 can attempt --

23     THE COURT:  The timeline, I think, will likely come

24 out from various people's testimony; right?  They're going to

25 know Mr. Carter went to trial.  Presumably they'll know when

Mr. Carter went to trial, and presumably they'll know when

Mr. Hightower was charged from other testimony?  Maybe, maybe

not.  I don't know whether the date of Mr. Hightower's charge

will be part of the record.

          MR. BUDLOW:  I don't believe it was part of the

Government's plan for their offer of proof to put in the date

of the indictment or date of his arrest on these charges.  So I

don't know that that's something they would otherwise learn.

          THE COURT:  They may be able to draw a reasonable

inference based on the number of years that have elapsed from

when Mr. Carter was tried, but you don't think there's going to

be specific evidence on that point?

          MR. BUDLOW:  Court's indulgence.

     For now I don't believe that would be part of the

Government's proof, and the Government's view is that the jury

wouldn't need to know anything about who was charged in the

earlier case except that there was a trial.  I mean, I don't

think we were planning on bringing up, for example, that

Mr. Mosley was tried with Mr. Carter and that he was convicted.

I think that would fly in the face of these jury instructions

as well, to make sure we caution witnesses not to discuss that

unless the defense wants it in for some reason.  Then we could

discuss it.

     The Government's view is that timeline, although they'll

see the gap in years, but juries hear old trials and retrials

1   and are often instructed, depending on the circumstances, not

2   to consider what happened previously.

3          THE COURT:  Okay.  Does the defense want to respond?

4          MR. GOLDMAN:  The only potential concern that I see

5   with the timeline there is if the jury is left with the

6   misimpression that Mr. Hightower was tried previously and that

7   this is somehow a retrial of a prior case.  I don't know

8   exactly how that -- how we would address that.  I don't know

9   that we have the information to address that right now, but

10  that would be a concern that we would have about the timeline

11  and that they would be left with that belief.  We could

12  probably come up with an instruction that would deal with that

13  if need be.

14         THE COURT:  I was just going to say you have

15  submitted jury instructions for the conclusion of the case as

16  we do in every case.  One thing I want the parties to think

17  about, confer about and then possibly propose to the Court is

18  appropriate limiting instructions to be given at different

19  points in time during the trial.  This does seems like a case

20  in which certain limiting instructions will be appropriate

21  during the course of testimony, not just at the end of the

22  trial.

23      For example, when we're talking about some of these other

24  things, the Wutoh murder, et cetera, it seems to me that it

25  will be safest to give certain limiting instructions as the

1    trial goes on.  This may be another circumstance, with respect

2    to the timeline and Mr. Carter, that parties can give some

3    thought to and potentially talk about whether some sort of

4    limiting instruction when that is going on.  Or at the end in

5    the regular jury instructions.  But it does seem to me that

6    appropriate limiting instructions are going to have to be used

7    throughout the case, and I encourage everyone to think about

8    ways to do that.

9          All right.  So based on what I'm hearing, at least as

10   things stand right now, I don't think arguments as to the

11   timeline and when people are charged are going to be

12   appropriate.  But, again, we'll see how things develop as the

13   case goes forward.

14         So that's 95.  Then we have the business records in 96 and

15   what notice has been provided, I guess, in terms of these

16   records?

17              MR. BUDLOW:  I see, the business records.  I may have

18   conflated these arguments earlier.  We've met and discussed

19   this with the defense.  I do believe that it was primarily

20   relating to certifications and phone records.  Let me just

21   double-check.  I don't believe that any of those... those fell

22   into three categories.  There were records from CDF, cell phone

23   records and potential time sheet records from the employer or

24   from a business.  I think we're still working through getting

25   certifications.  I feel like, based on our conversation, that

1   we were in agreement as to what the Government needed to

2   provide and that there wouldn't be objections based on

3   authenticity if we do that and that we don't need to address

4   any of those now.  Certainly defense can tell me if I

5   misspoke.

6          MR. GOLDMAN:  I think that's right.  We just want to

7   make sure we have the proper certifications, that they match to

8   the actual records that were provided at the time the

9   certification was done and that we have that all lined up

10  because we have things sort of scattered across discovery at

11  this point.  It's not always clear which certification matches

12  to which records.  We're not asking custodians be brought if

13  certification is proper.

14         THE COURT:  Okay.  So is it best I defer on the

15  business record motion then or grant it?  How should I deal

16  with that?  I certainly don't want to be -- I don't see a basis

17  at this point to exclude the business records, but I'm not sure

18  I should be admitting them either until --

19         MR. BUDLOW:  I'm happy for the Court to defer.  We

20  can bring it to the Court's attention before trial if any

21  disputes.

22         MR. GOLDMAN:  I agree.

23         THE COURT:  I'll defer on 96 and the parties will

24  alert me if we either have a dispute or if we decide we don't

25  have a dispute.

1          Then the last motion is the motion in limine to admit

2     co-conspirator statements, the trial memo.  It didn't request

3     pretrial determination of the admissibility.  I'm not sure if

4     there's a ruling I'm being asked to make here.  There was no

5     response to it.

6               MR. BUDLOW:  Thank you, Your Honor.  Completely

7     agree.  We wanted to just sort of tee that up for the Court.

8     The defendant hasn't responded nor was there necessarily a

9     reason to.  Unless the Court has questions, our view is that we

10    have at least one co-conspirator who's going to testify, and

11    the defense is certainly aware of most of the details of what's

12    going to come out.  Just going to plow forward unless they have

13    an objection to bring to the Court's attention beforehand.

14              THE COURT:  I will deny the motion because it was

15    filed as a motion because I'm not admitting anything at this

16    point in time, but I appreciate the notice about the

17    co-conspirator statements, and then we'll obviously deal with

18    things as they arise at trial.

19         All right.  That is, I think, what I had for motions.  Is

20    there anything that I'm missing with respect to motions?

21              MS. HAGAN:  No, Your Honor.

22              MR. GOLDMAN:  Not from the defense, Your Honor.

23              THE COURT:  All right.  The other thing I wanted to

24    mention is because I do the questionnaires for the jury, I will

25    need to get witness lists and lists of people who may be named

1    from the parties sooner rather than later.  Again, just because

2    you put someone on the list, you are not indicating a strict

3    intent to call them as a witness.  It's just a name that might

4    come up during the trial, but I need to have those lists so I

5    can finalize the questionnaires and get them to jury well in

6    advance.  The sooner people can provide me with those lists,

7    the better.  They should be as inclusive as necessary to make

8    sure we don't run into a situation where we're mentioning

9    someone later that the jury hasn't heard about.

10        All right.  I think that is what I had on my agenda for

11   today.  Do the parties have -- the other thing I wanted to talk

12   about is just some sort of basic issues about how we're going

13   to refer to prior things.  Some of this might be -- go back to

14   the limiting instruction discussion that I was having earlier.

15   Obviously because jail calls are going to be played, it is

16   going to be evident to the jury that Mr. Hightower was at

17   certain points in time incarcerated.  A limiting instruction,

18   it seems to me, as to that should be on the list of limiting

19   instructions that we're going to talk about.

20        I know that the defense raised an issue with respect to a

21   couple of terms that have been used certainly during the course

22   of briefing and some other things.

23        Mr. Hightower's charge in the Wutoh case, there's been

24   references to it as "extortion murder."  I will say that

25   extortion murder is not a concept that I'm particularly

1   familiar with, and I think it might be a somewhat confusing

2   phrase.  The charge in the case was extortion resulting in

3   death.  Can we just agree that to the extent we're referring to

4   what the charge was in that case, we'll say extortion resulting

5   in death and not extortion murder?

6           MS. HAGAN:  Yes, Your Honor.  Yes.

7           THE COURT:  Is that acceptable to the defense?

8           MR. GOLDMAN:  I think we could refer to it just as

9   the "Wutoh murder," I suppose, if that's where we're at right

10  now.  It's the word extortion that I think is unnecessarily

11  prejudicial here.

12          THE COURT:  Okay.  So extortion was the issue, not

13  the murder?

14          MR. GOLDMAN:  Well, obviously murder was --

15          MR. BUDLOW:  -- extortion because that would be way

16  worse.

17          MR. GOLDMAN:  I think that obviously you've already

18  ruled on the murder so I feel like that's coming in, so at this

19  point, we would prefer Wutoh murder to extortion murder.

20          THE COURT:  All right.  I don't like extortion murder

21  either.  I was going to go with extortion resulting in death,

22  but Wutah murder is also -- I don't think the extortion

23  component is particularly necessary with respect to what we're

24  getting into here.  Is that accurate?

25          MS. HAGAN:  Only in that he was ultimately charged

1    with extortion resulting in death and during some of the jail

2    calls when Mr. Hightower is discussing the loan that he made to

3    Mr. Wutoh and the fact that that loan was not being repaid, at

4    some point I think Mr. Hightower himself uses the word

5    extortion on one of the calls because he realizes that's what

6    the federal investigators are now looking into, extortion

7    resulting in death.

8            THE COURT:  Okay.  I'm not inclined to rule in any

9    way that's going to require redaction of calls, but I assume

10   that you're more talking about how it will be referred to in

11   discussion versus --

12           MR. GOLDMAN:  Generally, yeah.  In discussion and in

13   argument.

14           MS. HAGAN:  Okay.

15           THE COURT:  Right.  So if we can just go with Wutoh

16   murder, I guess, instead of extortion murder, it seems to me it

17   will allow everyone fair notice of what we're talking about and

18   we'll get to the heart of the situation.

19       Then there was the term about the witness who was the

20   intended victim.  Are we going to be referring to everyone by

21   name here?  The intended victim and then Ms. Ashburne?

22           MS. HAGAN:  Yes, yes.

23           THE COURT:  So we're not going to need to come up

24   with phraseology such as whistle blower?

25           MS. HAGAN:  No.  I don't think the Government should

1    be precluded or have to instruct witnesses that they can't use

2    that term.  If someone happens to reference the intended victim

3    as a whistle-blower or if the Government argues -- in closing

4    argument refers to that witness as a whistle-blower, that is

5    exactly what that witness --

6              THE COURT:  It's a lot easier to instruct the

7    Government than it is to instruct the witnesses.  I guess

8    whistle-blower introduces certain connotations that I'm not

9    sure entirely fit here.  She's certainly the person who

10   reported the initial criminal activity, and I think that fact

11   sounds like it's going to be made clear.

12             MS. HAGAN:  Yes.  About what was occurring at her own

13   place of employment so that essentially is where that phrase

14   might be used is what she did was she reported it to the

15   federal authorities about what she thought her employer was

16   doing improperly.

17             THE COURT:  Who else would use the term

18   whistle-blower besides you-all?  Are there other witnesses who

19   potentially would use that word?

20             MS. HAGAN:  Not that I know for sure, but I guess the

21   potential for a witness to -- during their testimony to refer

22   to that witness as the whistle-blower might happen.

23             THE COURT:  I think because we have a confusing

24   enough situation in this case with an intended victim and an

25   actual victim, I would prefer that we stick with calling people

1    by name and staying away from the word whistle-blower.  I think

2    using people's names will alleviate as much as possible any

3    confusion between the intended victim and actual victim.

4            MS. HAGAN:  Yes.

5            THE COURT:  As I said, use of whistle-blower tends to

6    create some other connotations too, so let's try to stick with

7    names and stay away from whistle-blower.

8            MS. HAGAN:  Yes, Your Honor.

9            THE COURT:  All right.  Are there other such issues

10   the parties can think of or any other type of issue we should

11   be discussing today?

12           MR. BUDLOW:  Your Honor, if this is the appropriate

13   time, you might have mentioned this at our last hearing or in a

14   filing, so I apologize.  Could you give us a sense of the court

15   day?  What time we'd be expected to arrive, when we'd stay,

16   breaks, things like that.

17           THE COURT:  Sure.  Typically I have counsel get

18   here -- depending on how many issues I think we have to

19   discuss -- between 9:00 and 9:30 in the morning.  I usually

20   have the jury report at 9:25 to be ready to go at 9:30.  My

21   goal always is to resolve as many issues outside of the jury's

22   presence as possible and to make maximal use of the jury's

23   time.  I don't like having to have bench conferences.  I don't

24   like having to have the jury go back to the jury room so we can

25   discuss something, so I always rely heavily on counsel to

1    highlight things in advance.  If they know something is going

2    to come up in someone's testimony, let's talk about it before

3    the trial day starts or at the end of the trial day.

4        So usually get started at 9:30 with the jury.  I typically

5    take a morning restroom break sometime around 11:00, 11:15, at

6    a natural breaking point in the testimony.  Lunch typically,

7    again, is between 12:30 and 1:00, depending on where we are,

8    for an hour.  Then I take a midafternoon break sometime in the

9    2:45 to 3:00, 3:15 range.  Again, all of this is sort of based

10   on natural breaking points in the testimony.

11       Then I typically let the jury go for the day somewhere

12   between 4:30 and 5:00 and then, again, have the end-of-the-day

13   period to discuss things with counsel.

14       I do like counsel to give each other a heads-up the night

15   before who's on tap for the next day, at least no later than

16   the night before.  If you'd like to do it earlier, you can

17   certainly do that as well.

18           MR. BUDLOW:  Thank you.

19           THE COURT:  That's the plan.  I think the dates that

20   we'll be sitting are in the voir dire that I laid out.  We have

21   a little bit of fits and starts here.  Obviously we have to --

22   as I think my clerk let you know, we have to pick the jury on

23   the 17th and not on the 16th which was news to me.  Apparently

24   it has to do with the fact that we are moving from one month

25   into another month, and we have different jury pools typically

1    for the month of June and the month of July.  Because this was

2    running from June into July, we had to call in a special jury

3    pool because the June jury pool is told you're in for June.

4    But because this is rolling into July, that's why we needed a

5    special jury pool and that's why we have to pick on Tuesday.

6    That's the best of my understanding.

7         So we'll be getting started on Tuesday.  Obviously I have

8    time on Monday so should the parties realize that issues have

9    arisen that we need to discuss, we can certainly convene at

10   some point on Monday to discuss them since we have that day

11   available to us.  Anything else that anyone can think of at

12   this point that we need to talk about today?

13              MS. HAGAN:  Not from the Government, Your Honor.

14              MS. WHALEN:  Nor from the defense.

15              THE COURT:  Okay.  If you reach agreement on certain

16   things ahead of time that you want to let me know, that's fine.

17   I'll be looking to get your witness list as soon as I can, and

18   we will go from there.

19        All right.  I thank you-all.

20              THE CLERK:  All rise.  This Honorable Court stands in

21   recess.

22        (Proceedings concluded at 11:47 a.m.)

23

24

25

1           CERTIFICATE OF OFFICIAL REPORTER

2           I, Patricia G. Mitchell, Registered Merit Reporter,

3    Certified Realtime Reporter, in and for the United States

4    District Court for the District of Maryland, do hereby certify,

5    pursuant to 28 U.S.C. § 753, that the foregoing is a true and

6    correct transcript of the stenographically-reported proceedings

7    held in the above-entitled matter and the transcript page

8    format is in conformance with the regulations of the Judicial

9    Conference of the United States.

10          Dated this 11th day of June 2025.

11

12                      *Patricia G. Mitchell*

13          _____
                Patricia G. Mitchell, RMR, CRR
14               Federal Official Reporter

15

16

17

18

19

20

21

22

23

24

25

**< Dates >** .

**11th day of June 2025.**
  71:10 .

**July,** 70:2, 70:4 .

**June** 70:1, 70:2, 70:3 .

**May 20, 2025** 1:17 .

**September of 2013,** 9:13 .
  .

**< 0 >** .

**00** 68:19, 69:5, 69:7, 69:9,
  69:12 .

**04** 2:2 .
  .

**< 1 >** .

**1** 69:7 .

**1-3** 24:10, 45:1 .

**10** 2:2 .

**10-25** 24:10 .

**103** 46:24 .

**11** 69:5, 70:22 .

**12** 69:7 .

**15** 69:5, 69:9 .

**16th** 69:23 .

**17th** 69:23 .

**1:** 1:10 .
  .

**< 2 >** .

**2** 69:9 .

**2-18** 53:19, 55:4, 55:5 .

**20910** 1:40 .

**21201** 1:32 .

**22314** 1:45 .

**23-186** 2:9 .

**24** 24:10 .

**25** 68:20 .

**28** 71:5 .

**2C** 7:2 .
  .

**< 3 >** .

**3** 69:9 .

**3-4** 53:19, 53:20, 53:22, 55:5 .

**3-5** 54:13 .

**3-7** 54:20 .

**3-cr-00186-sag-1** 1:10 .

**30** 68:19, 68:20, 69:4, 69:7,
  69:12 .

**35** 5:12, 5:17, 5:22 .

**36** 1:31 .
  .

**< 4 >** .

**4** 69:12 .

**400** 1:39 .

**404(b** 7:4, 7:18, 8:3, 8:8, 8:20,
  24:8 .

**421** 1:44 .

**45** 24:10, 69:9 .

**47** 70:22 .

**4th** 1:31 .
  .

**< 5 >** .

**5** 69:12 .

**505** 1:44 .
  .

**< 7 >** .

**75** 3:13, 3:14 .

**753** 71:5 .

**7C** 1:23 .
  .

**< 8 >** .

**801** 1:39 .
  .

**< 9 >** .

**9** 53:20, 68:19, 68:20, 69:4 .

**94** 24:7, 45:5 .

**95** 24:7, 45:7, 46:23, 47:17, 47:20,
  61:14 .

**96** 47:16, 61:14, 62:23 .
  .

**< A >** .

**a.m.** 2:2, 70:22 .

**ability** 48:11 .

**able** 11:18, 16:22, 16:25, 18:19,
  49:5, 49:18, 52:1, 55:24, 56:12,
  59:9 .

**above-entitled** 71:7 .

**acceptable** 65:7 .

**accomplices** 54:8 .

**accurate** 47:11, 65:24 .

**across** 62:10 .

**action** 21:25 .

**activities** 11:20, 15:11 .

**activity** 15:13, 22:22, 22:23, 23:8,
  45:21, 45:22, 67:10 .

**acts** 8:15 .

**actual** 19:23, 20:12, 62:8, 67:25,
  68:3 .

**actually** 3:12, 15:1, 15:4,
  18:12 .

**add** 4:15, 7:21, 15:21, 55:24 .

**addition** 12:20 .

**additional** 7:24, 49:25 .

**Additionally** 10:9, 12:19, 13:14,
  13:23, 15:17, 15:23, 54:13,
  54:20 .

**address** 47:9, 47:14, 60:8, 60:9,
  62:3 .

**addressed** 7:13 .

**adjacent** 58:21 .

**admissibility** 63:3 .

**admissible** 8:3, 8:7, 8:20,
  46:12 .

**Admit** 7:18, 23:15, 24:8, 45:7,
  63:1 .

**admitting** 62:18, 63:15 .

**advance** 7:12, 64:6, 69:1 .

**agency** 9:8 .

**agenda** 2:22, 64:10 .

**agree** 11:6, 19:21, 19:22, 21:6,
  46:4, 48:13, 48:16, 49:21, 57:4,
  62:22, 63:7, 65:3 .

**agreement** 20:18, 62:1,
  70:15 .

**agreements** 21:3 .

**ahead** 70:16 .

**alert** 62:24 .

**Alexandria** 1:45 .

**allegation** 12:22, 12:23 .

**allegations** 12:9, 12:11, 12:12,
  16:20 .

**alleged** 10:3, 12:10, 21:23 .

**allegedly** 17:21 .

**alleviate** 58:2 .

**allow** 4:8, 21:12, 56:5, 58:2,
  66:17 .

**allowed** 53:2, 54:12 .

**allowing** 57:13 .

**alone** 54:25 .

**aloud** 3:21 .

**already** 22:23, 48:13, 51:10,
  65:17 .

**alternates** 5:4, 5:15 .

**Alternative** 7:18, 8:3, 8:20 .

**although** 10:22, 14:1, 46:20,
  59:24 .

**AMERICA** 1:5 .

**amount** 15:22, 20:16 .

**answer** 2:25, 3:9, 3:22, 4:4, 4:7,
  4:19, 6:10, 11:5 .

**answers** 45:25 .

**anybody** 53:15 .

**apologize** 68:14 .

**Apparently** 69:23 .

**appear** 11:17 .

**applies** 54:14 .

**apply** 53:22 .

**appreciate** 52:8, 63:16 .

**approach** 22:24 .

**approaching** 15:24, 22:22 .

**appropriate** 54:5, 58:2, 60:18,
  60:20, 61:6, 61:12, 68:12 .

**argue** 7:21, 48:18, 49:1, 49:5,
  49:18, 50:20, 51:20, 52:1,
  52:25, 55:15, 56:14, 57:1,
  57:7 .

**argues** 67:3 .

**arguing** 47:20, 48:9, 50:8, 50:10,
  50:14, 50:17 .

**argument** 45:8, 50:6, 52:6, 53:20,
  66:13, 67:4 .

**arguments** 52:14, 61:10,
  61:18 .

**arise** 63:18 .

**arisen** 70:9 .

**arising** 13:1 .

**around** 6:13, 69:5 .

**arrest** 59:7 .

**arrested** 56:15 .

**arrive** 68:15 .

**articulate** 18:6 .

**Ashburne** 15:16, 16:4, 66:21 .

**aside** 10:23 .

**asks** 52:24 .

**assistant** 23:25 .

**associate** 11:1 .

**Assume** 11:6, 66:9 .

**attempt** 56:6, 58:22 .

**attempts** 54:9 .

**attention** 62:20, 63:13 .

**Attorney** 1:30, 10:10, 23:25 .

**authenticity** 62:3 .

authorities 67:15 .
auto 14:21 .
available 70:11 .
Ave 1:39 .
avoid 20:19 .
aware 15:2, 63:11 .
away 68:1, 68:7 .
.

< B >.
back 4:13, 23:21, 47:7, 64:13,
    68:24 .
Baltimore 1:16, 1:32, 13:15 .
bank 57:8 .
base 52:16 .
based 16:11, 18:13, 49:12, 54:23,
    57:16, 59:10, 61:9, 61:25, 62:2,
    69:9 .
basic 11:11, 13:16, 64:12 .
basis 62:16 .
Bear 54:7, 54:21 .
became 15:2 .
beforehand 63:13 .
began 9:6 .
beginning 9:6 .
behalf 2:10, 2:14, 2:16 .
behavior. 8:15 .
belief 49:1, 49:13, 49:20,
    60:11 .
beliefs 49:3 .
believe 17:10, 17:13, 20:14, 21:11,
    22:18, 47:9, 50:9, 50:10, 56:11,
    59:5, 59:14, 61:19, 61:21 .
believed 10:20 .
believes 11:23 .
bench 68:23 .
benefit 51:8 .
besides 67:18 .
best 20:7, 20:8, 62:14, 70:6 .
better 55:25, 64:7 .
beyond 52:12, 52:15, 52:20, 55:23,
    56:1, 56:3, 57:12, 57:18 .
beyond-a-reasonable-doubt
    56:13 .
big 51:5 .
billing 12:16, 13:2 .
bit 7:13, 69:21 .
blank. 45:1 .
blower 66:24 .
bottom 6:3 .

bounds 50:4, 57:1 .
box 4:2 .
break 69:5, 69:8 .
breakdown 15:20 .
breaking 69:6, 69:10 .
breaks 68:16 .
briefing 64:22 .
briefly 15:10, 56:19 .
bring 4:2, 49:8, 49:11, 49:12,
    49:15, 62:20, 63:13 .
bringing 22:11, 56:6, 59:18 .
brought 49:24, 50:5, 57:13,
    62:12 .
BUDLOW 1:29, 2:10, 5:25, 6:1, 6:9,
    23:23, 24:2, 45:17, 46:16,
    46:22, 47:3, 47:17, 47:19, 48:4,
    48:6, 52:6, 52:8, 53:7, 57:5,
    58:10, 58:16, 59:5, 59:13,
    61:17, 62:19, 63:6, 65:15,
    68:12, 69:18 .
business 47:16, 61:14, 61:17,
    61:24, 62:15, 62:17 .

.
.

< C >.
C. 71:5 .
call 2:6, 9:7, 20:7, 20:8, 64:3,
    70:2 .
Calling 2:8, 67:25 .
calls 9:25, 10:5, 12:8, 12:20, 13:19,
    13:20, 18:24, 19:15, 19:24,
    47:6, 64:15, 66:2, 66:5,
    66:9 .
Carter 45:11, 45:15, 45:18, 45:24,
    46:5, 46:19, 48:12, 49:7, 49:25,
    50:15, 50:20, 50:21, 51:4, 51:6,
    52:2, 52:3, 53:5, 56:25, 58:25,
    59:1, 59:11, 59:19, 61:2 .
cases 16:20, 20:19, 52:13, 57:2,
    57:12, 58:13 .
categories 9:24, 19:3, 61:22 .
category 8:17 .
caught 57:9 .
cause 4:14, 6:2, 6:6 .
caution 59:21 .
CDF 61:22 .
cell 13:21, 45:16, 47:10,
    61:22 .
certain 7:12, 21:21, 45:8, 53:24,
    60:20, 60:25, 64:17, 67:8,

70:15 .
Certainly 13:11, 20:23, 21:2, 21:3,
    22:15, 23:9, 48:25, 49:2, 49:5,
    50:8, 51:16, 57:2, 62:4, 62:16,
    63:11, 64:21, 67:9, 69:17,
    70:9 .
CERTIFICATE 71:1 .
certification 62:9, 62:11,
    62:13 .
certifications 47:12, 61:20, 61:25,
    62:7 .
Certified 13:12, 71:3 .
certify 71:4 .
cetera 60:24 .
challenge 16:23, 16:25 .
changed 51:9 .
character 20:11 .
characterization 19:23 .
characterizations 17:1 .
charge 49:20, 50:3, 54:11, 59:3,
    64:23, 65:2, 65:4 .
charged 7:16, 8:19, 11:7, 13:1,
    14:15, 14:17, 14:21, 14:23,
    15:14, 16:15, 22:8, 47:24, 49:6,
    49:18, 49:24, 50:17, 52:19,
    53:1, 53:3, 53:10, 53:15, 54:5,
    55:10, 57:24, 58:18, 58:19,
    59:2, 59:16, 61:11, 65:25 .
charges 8:2, 22:6, 49:8, 49:11,
    49:12, 49:15, 49:24, 50:5, 53:4,
    59:7 .
charging 11:24, 50:15, 55:19,
    57:22, 57:23 .
Charles 1:31 .
chart 45:16 .
charts 46:8 .
checkmarks 3:22 .
choice 49:22 .
Circuit 56:5 .
circulated 2:24 .
circumstance 61:1 .
circumstances 18:14, 54:1,
    60:1 .
circumstantial 57:11 .
cited 8:13 .
cites 52:13 .
claim 54:9 .
claims 54:3, 58:20 .
clarify 16:10, 58:15 .
clear 10:6, 53:17, 54:1, 54:10,

62:11, 67:11 .
Clearly 8:2, 19:19, 51:10,
    58:9 .
CLERK 2:24, 3:16, 4:3, 5:16, 69:22,
    70:20 .
client 18:25, 19:16, 20:5 .
clipboards 3:19, 3:25 .
close 3:17, 20:6 .
closing 67:3 .
co-conspirator 15:24, 16:3, 63:2,
    63:10, 63:17 .
co-defendant 52:17 .
co-defendants 52:22, 54:14,
    54:21 .
co-the 56:20 .
cognizant 23:11 .
collect 3:25 .
combination 53:19 .
comfortable 15:24, 22:22 .
coming 3:13, 51:15, 65:18 .
comments 54:3 .
commission 45:14 .
commit 15:8, 17:11 .
committed 11:16, 15:1, 15:4, 18:1,
    18:17, 22:15, 45:11 .
committing 22:24 .
common 10:23 .
communications 21:5, 45:22,
    49:2 .
company 9:11, 10:4, 12:16,
    12:18 .
comparative 47:21 .
comparatively 57:6 .
comparing 51:17, 56:25 .
complaining 10:2, 10:7 .
complete 8:22 .
Completely 14:19, 46:19,
    63:6 .
compliant 47:12 .
complicated 7:14, 19:9 .
component 65:23 .
comprised 20:15 .
Computer-aided 1:49 .
conceded 46:20 .
concept 64:25 .
concern 60:4, 60:10 .
concluded 70:22 .
conclusion 60:15 .
confer 60:17 .
Conference 1:21, 2:21, 71:9 .

conferences 68:23 .
confessed 57:10 .
conflated 61:18 .
conformance 71:8 .
confusing 65:1, 67:23 .
confusion 68:3 .
connection 8:23, 11:2 .
connotations 67:8, 68:6 .
consider 48:21, 52:10, 52:16,
    52:22, 54:15, 55:6, 55:21,
    56:12, 58:8, 60:2 .
consideration 52:21 .
consideration. 55:8 .
considerations 55:16, 56:7 .
considering 52:11 .
conspiracy 19:11 .
consulting 47:13 .
contemplated 21:17 .
content 19:23 .
contest 46:5 .
contested 45:11, 45:12 .
context 14:19, 16:2 .
continue 45:23 .
convene 70:9 .
conversation 61:25 .
convicted 14:8, 17:7, 17:9, 18:17,
    19:13, 50:12, 51:14,
    59:19 .
conviction 13:7, 13:13, 17:5,
    17:13, 18:11, 18:23, 21:13,
    22:17, 23:15 .
cooperate 51:16 .
cooperator 48:12, 56:11,
    56:12 .
cooperators 49:8, 49:19, 50:17,
    53:1, 55:10, 57:25, 58:19 .
copy 13:12 .
correct 71:6 .
corroborating 45:20, 45:24 .
couched 21:21 .
COUNSEL 2:5, 4:8, 4:11, 46:24,
    54:9, 68:17, 68:25, 69:13,
    69:14 .
County 13:15 .
couple 8:21, 16:10, 64:21 .
course 7:13, 9:12, 60:21,
    64:21 .
Courtroom 1:23, 3:19, 3:21, 4:1,
    4:13, 23:22, 23:24, 55:20,
    55:21, 56:22 .

Crawford 11:1 .
create 68:6 .
credibility 20:11, 51:4, 51:6, 51:11,
    51:12, 54:7 .
crime 12:1, 13:17, 14:21, 14:23,
    15:1, 15:4, 15:6, 15:9, 22:25,
    54:5, 57:10 .
crimes 7:15, 8:19, 11:7, 16:12,
    16:15, 21:21, 21:23 .
CRIMINAL 1:9, 22:23, 23:8,
    67:10 .
critical 14:9, 21:15 .
cross-examine 48:11 .
crossed 11:9 .
CRR 71:16 .
CSO 23:24 .
custodians 62:12 .
customer 11:25, 15:19 .
cutting 3:17 .
CW-1 49:25 .

.

< D > .
Dan 2:15 .
danger 57:20 .
Daniel 1:42, 1:43 .
data 46:10 .
date 13:18, 59:3, 59:6, 59:7 .
Dated 71:10 .
dates 69:19 .
David 9:4, 10:16, 10:25, 11:2,
    18:7 .
Davon 49:25 .
day 68:15, 69:3, 69:11, 69:15,
    70:10 .
deal 56:21, 57:20, 60:12, 62:15,
    63:17 .
dealing 12:2, 23:3 .
death 65:3, 65:5, 65:21, 66:1,
    66:7 .
debate 19:7 .
decide 50:24, 62:24 .
decided 49:15, 56:16 .
decision 6:5, 6:8, 17:21, 55:1,
    56:13, 57:16, 57:24, 58:1 .
decisions 50:16, 57:22 .
DEFENDANT 1:12, 1:35, 2:19,
    46:23, 52:12, 52:23, 54:15,
    54:17, 54:23, 54:24, 54:25,
    55:1, 55:7, 55:10, 55:22, 58:9,

58:17, 63:8 .
defendant. 55:2 .
defendants 47:23, 53:11, 53:24,
    53:25, 54:4, 56:6, 56:20 .
defer 62:14, 62:19, 62:23 .
define 55:25, 56:6 .
defined 55:24 .
definition 8:12 .
degree 13:10, 15:7 .
deliberations. 54:3 .
delivered 12:14, 12:17, 13:2 .
delivery 12:13, 12:18 .
delve 14:1 .
demographic 4:10 .
denied 45:6 .
deny 63:14 .
denying 23:14 .
Department 13:16 .
depending 60:1, 68:18, 69:7 .
described 16:22 .
designed 55:17 .
desire 18:8 .
detail 12:1, 14:1 .
details 11:15, 11:16, 12:9,
    63:11 .
Detective 10:13, 13:14,
    18:24 .
determination 63:3 .
determined 20:13, 54:17 .
determining 55:21 .
develop 61:12 .
different 8:25, 9:17, 17:1, 47:22,
    48:7, 50:1, 56:9, 58:21, 60:18,
    69:25 .
difficult 11:5 .
dire 2:25, 3:9, 6:10, 6:11, 6:24,
    69:20 .
directly 9:1 .
disagree 19:23 .
discovery 10:10, 10:12,
    62:10 .
discriminatory 54:9 .
discuss 7:10, 24:7, 47:25, 59:21,
    59:23, 68:19, 68:25, 69:13,
    70:9, 70:10 .
discussed 47:10, 61:18 .
discusses 13:19, 13:20,
    53:20 .
discussing 17:16, 66:2,
    68:11 .

discussion 64:14, 66:11,
    66:12 .
discussions 10:4 .
disposition 17:22, 17:24 .
dispute 62:24, 62:25 .
disputes 62:21 .
disregard 54:6 .
distinction 15:5 .
distinctions 58:12 .
District 1:1, 1:2, 71:4 .
DIVISION 1:3 .
documents 2:25 .
doing 6:7, 47:13, 67:16 .
done 3:13, 62:9 .
door 4:1 .
double-check 61:21 .
doubt 52:1, 55:23, 56:2, 56:3, 56:6,
    57:7, 57:12, 57:19 .
down 19:8, 23:10, 46:15,
    51:8 .
draw 49:23, 52:18, 53:22, 55:12,
    57:7, 58:12, 59:9 .
driver 45:19 .
dropped 19:12 .
drug 11:20, 11:24, 12:2, 15:11,
    15:12, 20:3, 20:9, 20:15, 22:18,
    23:3 .
drugs 11:25, 20:15, 23:4 .
due 16:22 .
During 7:13, 9:12, 60:19, 60:21,
    64:4, 64:21, 66:1, 67:21 .

.

< E > .
E. 1:29 .
earlier 49:21, 58:18, 59:17, 61:18,
    64:14, 69:16 .
early 9:13, 10:11 .
earnings 11:25, 15:19 .
easier 67:6 .
easy 3:8 .
effectively 16:19 .
efficient 13:5, 13:12 .
either 6:13, 55:15, 57:7, 57:20,
    62:18, 62:24, 65:21 .
elapsed 59:10 .
element 15:14 .
eliciting 58:17 .
eliminated 6:13 .
else. 54:19 .

emotions 8:14 .
employer 61:23, 67:15 .
employment 67:13 .
encourage 20:23, 21:3, 61:7 .
end 6:7, 17:8, 23:22, 60:21, 61:4, 69:3 .
end-of-the-day 69:12 .
enforcement 9:10, 10:15 .
engage 22:21 .
engaging 15:25, 23:8 .
enormously 17:6 .
enough 50:3, 67:24 .
entertain 4:11, 4:13, 23:9 .
entire 3:18, 9:9, 10:8 .
entirely 67:9 .
entirety 3:24 .
especially 54:8 .
Esquire 1:28, 1:29, 1:37, 1:42 .
essentially 10:3, 11:7, 12:7, 12:14, 67:13 .
establish 13:5, 14:4, 20:4 .
established 9:24 .
establishes 10:25, 15:13, 15:23 .
et 60:24 .
events 16:25 .
eventual 17:22 .
eventually 12:25, 14:8 .
everybody 5:13 .
everyone 2:3, 53:9, 61:7, 66:17, 66:20 .
everything 47:24 .
evident 64:16 .
exactly 55:15, 60:8, 67:5 .
example 9:23, 14:12, 14:20, 17:25, 53:9, 53:18, 59:18, 60:23 .
except 54:7, 59:17 .
excited 8:14 .
exclude 22:17, 58:4, 62:17 .
excluding 23:15 .
excuse 4:1 .
exhibit 45:20 .
exhibits 45:8, 45:15, 46:9, 46:10 .
expect 22:4, 48:11 .
expected 68:15 .
explained 4:22, 15:21 .
expressed 48:8 .
expressly 52:15, 52:24,

57:21 .
extensive 23:3 .
extent 11:22, 16:21, 19:21, 23:13, 45:12, 46:22, 50:4, 57:1, 65:3 .
extortion 8:24, 14:2, 64:24, 64:25, 65:2, 65:4, 65:5, 65:10, 65:12, 65:15, 65:19, 65:20, 65:21, 65:22, 66:1, 66:5, 66:6, 66:16 .
extrinsic 23:15 .
.
.
< F > .
face 59:20 .
faced 8:14 .
faces 8:2 .
facing 16:15, 48:12 .
fact 9:23, 10:23, 10:24, 11:11, 11:12, 13:7, 13:17, 13:21, 15:8, 17:24, 17:25, 18:5, 18:7, 19:16, 20:9, 23:7, 49:23, 51:6, 53:24, 54:6, 54:7, 55:9, 56:1, 56:15, 58:8, 66:3, 67:10, 69:24 .
facts 7:14, 9:1, 13:16, 14:18, 46:5, 57:2, 57:13 .
factually 10:22 .
fair 18:12, 18:15, 22:19, 23:6, 23:8, 23:12, 49:4, 49:23, 50:6, 51:20, 66:17 .
fall 8:16 .
falls 54:24 .
falsifying 12:13 .
familiar 65:1 .
far 20:3, 20:4, 23:10 .
fashion 11:6 .
favor 57:23 .
favorable 53:23 .
fear 5:22 .
Federal 9:8, 9:9, 66:6, 67:15, 71:17 .
feel 61:25, 65:18 .
fell 61:21 .
few 21:10 .
filed 24:11, 53:4, 63:15 .
filing 68:14 .
finalize 64:5 .
Finally 55:3 .
find 57:12 .
finding 18:2, 18:15 .

fine 5:9, 70:16 .
finished 3:24, 4:12 .
First 2:24, 3:10, 7:17, 21:11, 22:5, 48:1, 48:2, 52:12, 55:5 .
fit 3:14, 67:9 .
fits 69:21 .
five 7:9 .
flag 6:6 .
flipping 4:3, 4:5 .
Floor 1:31 .
fly 59:20 .
focus 9:10, 22:14 .
follow 4:22, 48:22, 48:23 .
follow-up 4:5, 4:8, 4:11 .
following 45:4 .
foreclose 21:2 .
foregoing 71:5 .
form 3:3 .
format 71:8 .
forward 24:3, 45:23, 49:9, 49:19, 50:6, 50:18, 53:1, 55:11, 57:25, 58:20, 61:13, 63:12 .
found 18:13, 56:3 .
Fourth 56:5 .
fraud 7:3, 8:23, 9:3, 9:5, 9:10, 10:3, 10:11, 10:15, 11:12, 11:15, 12:6, 12:10, 12:16, 12:22, 13:1, 13:9, 19:11, 19:18, 22:2 .
free 55:12 .
friend 10:25, 20:7, 20:8, 22:21 .
friends 20:6 .
front 48:6, 48:10 .
.
.
< G > .
G. 71:2, 71:16 .
game 17:8, 22:19, 23:6, 23:8 .
gap 59:25 .
gave 17:25 .
general 55:5 .
Generally 4:1, 4:8, 12:15, 19:22, 45:25, 57:4, 58:11, 66:12 .
genuine 8:14 .
Getting 11:10, 11:14, 12:1, 15:2, 57:21, 58:10, 61:24, 65:24, 70:7 .
give 5:14, 12:4, 60:25, 61:2, 68:14, 69:14 .
given 58:13, 60:18 .

gives 51:16, 51:25, 55:17 .
goal 68:21 .
grand 14:21 .
grant 58:4, 62:15 .
granted 45:5 .
granting 23:14 .
Great 6:9, 12:1, 57:20 .
greater 15:3 .
grossly 52:9 .
grounds 51:16 .
guess 4:25, 11:19, 12:23, 23:13, 61:15, 66:16, 67:7, 67:20 .
guilt 16:24, 52:11, 52:20, 54:19, 54:22, 55:7, 55:19, 57:12, 57:18 .
guilty 18:5, 50:25, 55:23, 56:3 .
.
.
< H > .
H. 1:42 .
hand 3:19 .
handling 12:5 .
hanging 55:15 .
happen 3:15, 53:14, 67:22 .
happened 60:2 .
happening 10:4 .
happens 67:2 .
happily 7:10 .
happy 7:21, 47:25, 62:19 .
Hardship 4:14, 6:2, 6:6, 6:8 .
Harry 11:1 .
heading 46:15 .
heads-up 69:14 .
healthcare 7:3, 8:23, 9:3, 9:5, 9:10, 10:11, 10:15, 11:12, 11:15, 12:6, 12:21, 13:1, 13:9, 19:11, 19:17, 22:2, 22:6 .
healthcare- 9:21 .
hear 16:3, 47:25, 48:1, 48:2, 59:25 .
heard 64:9 .
HEARING 1:21, 6:1, 61:9, 68:13 .
heart 66:18 .
heavily 68:25 .
held 24:9, 45:4, 71:7 .
help 55:24 .
hereby 71:4 .
herself 19:3 .

higher 15:3 .
highlight 69:1 .
highly 18:7 .
Hinton 13:14, 18:24 .
hire 11:24, 15:15 .
history 12:2 .
hit 4:18, 13:21 .
hold 6:3, 8:18 .
homicide 13:17 .
Honorable 1:22, 70:20 .
hope 14:13, 48:22 .
hopefully 5:23 .
hotline 9:8 .
hour 69:8 .
hung 53:10 .
.
.

< I > .
idea 54:11 .
identify 10:17 .
identity 8:6 .
immediately 4:14 .
impeach 51:17 .
implicated 9:1 .
importance 18:22, 22:8 .
important 19:6, 21:24 .
improperly 67:16 .
impugn 20:10 .
inappropriate 52:10, 55:16,
    56:8 .
incarcerated 10:1, 64:17 .
inclined 52:6, 58:7, 66:8 .
include 19:3, 45:20 .
included 6:15, 10:13, 47:8,
    55:4 .
including 10:6 .
inclusive 64:7 .
incorrectly 14:22 .
increases 14:5, 14:6 .
indicating 64:2 .
indicted 10:11, 54:2, 54:7 .
indictment 49:6, 59:7 .
indictment. 53:25 .
individual 54:22 .
individuals 53:4 .
indulgence 6:20, 51:22,
    59:13 .
inextricably 16:1 .
inference 48:17, 49:23, 52:18,
    53:22, 56:7, 56:8, 57:21,

59:10 .
inferences 55:13, 55:14 .
influence 55:1 .
information 4:10, 9:14, 9:19, 9:21,
    9:22, 10:14, 10:24, 14:16, 23:3,
    45:21, 50:1, 51:9, 60:9 .
initial 9:7, 9:9, 13:16, 49:6, 55:11,
    67:10 .
innocence 51:7, 52:12,
    54:19 .
innocent 14:23, 18:3 .
innocently 14:22 .
insofar 54:7 .
instances 8:5 .
instead 66:16 .
instruct 48:22, 54:5, 54:16, 67:1,
    67:6, 67:7 .
instructed 52:22, 60:1 .
Instruction 48:21, 53:18, 53:20,
    54:13, 54:20, 55:3, 55:4, 60:12,
    61:4, 64:14, 64:17 .
instructions 3:1, 3:2, 6:24, 53:16,
    55:16, 56:20, 56:23, 58:6, 58:7,
    58:10, 58:13, 59:20, 60:15,
    60:18, 60:20, 60:25, 61:5, 61:6,
    64:19 .
instructive 54:15, 54:21 .
integral 19:6, 19:20 .
intend 11:19, 13:4, 45:23 .
intended 9:5, 9:7, 9:14, 10:2, 10:4,
    10:7, 10:14, 10:17, 10:21,
    10:24, 12:15, 14:9, 15:16,
    15:25, 21:16, 66:20, 66:21,
    67:2, 67:24, 68:3 .
intends 7:15, 8:1 .
intent 12:4, 64:3 .
intentionally 45:1 .
intertwined 16:2 .
interviews 10:13 .
Intrinsic 7:18, 8:2, 8:19, 11:7,
    11:17, 12:1, 21:11, 22:25 .
introduce 8:1, 8:16, 13:6, 13:12,
    14:3, 52:14 .
introduces 67:8 .
investigated 9:17 .
investigating 9:10 .
investigation 9:3, 9:4, 9:9, 9:12,
    9:14, 9:15, 10:6, 10:11, 10:15,
    12:7, 13:19 .
investigations 9:19, 10:21,

10:22 .
investigator 13:15 .
investigators 66:6 .
involved 11:24, 22:23, 23:8 .
involvement 13:6, 13:24 .
involves 47:5 .
irrational 8:15 .
issue 5:2, 47:8, 48:14, 48:24,
    50:22, 51:4, 64:20, 65:12,
    68:10 .
issues 5:3, 5:18, 5:25, 7:11, 64:12,
    68:9, 68:18, 68:21, 70:8 .
itself 18:11, 20:12, 20:16, 21:13,
    22:17, 23:16, 51:4, 51:21 .
.
.

< J > .
jail 10:1, 12:8, 13:19, 14:18, 18:24,
    19:15, 64:15, 66:1 .
Judicial 71:8 .
July 70:1 .
June 70:3 .
juries 53:10, 59:25 .
juror 3:19, 4:12 .
jurors 3:13, 4:1, 4:16, 4:19, 5:1,
    5:13, 5:22 .
jury. 54:10 .
.
.

< K > .
keep 53:14 .
keeping 8:9 .
key 16:17 .
kill 15:3, 18:6, 18:7, 18:8 .
Kim 1:28, 2:9 .
kind 20:17, 22:21 .
kinds 21:6, 57:12 .
King 1:44 .
knowing 15:3, 15:8 .
knowledge 8:5, 9:25 .
.
.

< L > .
lack 54:18, 54:25 .
laid 69:20 .
language 8:12 .
largely 16:9, 48:16 .
last 46:24, 63:1, 68:13 .
later 10:6, 52:19, 64:1, 64:9,
    69:15 .

Law 1:38, 1:43, 4:3, 9:10,
    10:14 .
learn 59:8 .
learned 14:23 .
learning 9:18, 12:15 .
least 5:6, 49:17, 52:9, 61:9, 63:10,
    69:15 .
leave 55:15 .
leaves 47:19 .
left 45:1, 60:5, 60:11 .
less 5:2 .
lesser 56:4 .
level 11:11 .
life 51:10, 51:15 .
likely 48:17, 58:23 .
Limine 7:7, 7:9, 7:11, 7:17, 7:18,
    23:14, 24:8, 45:7, 47:20,
    63:1 .
limit 21:8 .
limited 4:8, 4:11, 14:14,
    14:18 .
limiting 60:18, 60:20, 60:25, 61:4,
    61:6, 64:14, 64:17, 64:18 .
line 11:9, 55:5 .
lined 62:9 .
Lines 24:10, 45:1 .
linked 9:4 .
list 4:16, 11:25, 15:19, 64:2, 64:18,
    70:17 .
listed 17:5 .
lists 63:25, 64:4, 64:6 .
litigate 18:20 .
litigation 20:20 .
little 69:21 .
loan 66:2, 66:3 .
location 45:22, 47:5 .
long 20:8, 20:9, 23:3 .
longer 19:9 .
look 51:25 .
looked 22:9 .
looking 22:24, 23:2, 53:16, 66:6,
    70:17 .
looks 5:17, 52:1 .
lose 5:22 .
lot 11:6, 18:16, 18:20, 19:1, 20:20,
    45:8, 46:25, 47:10, 50:9,
    67:6 .
loud 52:9, 52:10 .
Lunch 69:6 .
.

**< M >** .

maintaining 51:7 .
Maryland 1:2, 1:16, 71:4 .
match 62:7 .
matches 46:11, 62:11 .
math 5:14 .
matter 5:5, 71:7 .
Matthew 1:10, 2:9 .
maximal 68:22 .
MD 1:32, 1:40 .
mean 14:11, 23:2, 56:2, 57:25, 59:17 .
Meaning 15:18 .
means 20:1 .
meant 56:21 .
Medicaid 12:17 .
medical 12:13, 12:17 .
members 23:24 .
memo 10:17, 63:2 .
memorandum 10:12 .
mention 63:24 .
mentioned 68:13 .
mentioning 64:8 .
merged 55:4 .
Merit 71:2 .
met 46:24, 57:18, 61:18 .
method 3:12, 15:16 .
midafternoon 69:8 .
mind 8:9, 24:4, 51:9, 54:22 .
minute 4:17 .
misimpression 60:6 .
misread 53:21 .
missing 63:20 .
misspoke 62:5 .
Mitchell 71:2, 71:16 .
moment 5:14, 6:20, 7:7, 11:6, 17:12 .
Monday 70:8, 70:10 .
month 69:24, 69:25, 70:1 .
morning 2:3, 2:5, 2:8, 2:11, 2:13, 2:15, 2:17, 2:18, 2:19, 68:19, 69:5 .
Mosley 45:11, 45:16, 45:19, 46:6, 46:19, 49:7, 50:15, 59:19 .
Motion 7:4, 7:17, 8:1, 23:14, 23:21, 24:8, 45:7, 46:14, 46:23, 47:19, 56:24, 58:4, 62:15, 63:1, 63:14, 63:15 .
MOTIONS 1:21, 6:2, 7:7, 7:9, 7:11,
63:19, 63:20 .
motivation 21:24 .
motive 8:5, 9:18, 10:25, 13:10, 14:5, 14:7, 14:24, 15:3, 15:7, 16:14, 18:8 .
move 6:3, 45:7 .
moved 6:13 .
moving 69:24 .
multiple 10:5, 20:5 .
murder 64:24 .
murdered 9:13, 17:22 .

.

**< N >** .

name 64:3, 66:21, 68:1 .
named 53:25, 63:25 .
names 68:2, 68:7 .
natural 69:6, 69:10 .
nature 5:23, 7:25, 12:16, 21:22, 21:23, 22:19, 23:4, 23:6, 23:11 .
near 13:22 .
necessarily 18:15, 18:18, 19:25, 63:8 .
necessary 7:8, 8:8, 16:13, 53:12, 64:7, 65:23 .
need 2:23, 4:18, 4:19, 4:25, 5:1, 5:12, 7:10, 7:12, 14:1, 16:22, 16:25, 45:13, 46:20, 47:2, 47:8, 47:9, 47:11, 47:14, 49:17, 58:15, 59:16, 60:13, 62:3, 63:25, 64:4, 66:23, 70:9, 70:12 .
needed 62:1, 70:4 .
needs 11:8 .
news 69:23 .
Next 3:9, 4:1, 23:20, 69:15 .
night 45:22, 69:14, 69:16 .
No. 1:9, 24:7, 66:25 .
None 8:15 .
Nor 63:8, 70:14 .
NORTHERN 1:3 .
note 17:4, 18:22 .
notes 1:49 .
Nothing 6:18, 6:22, 18:3 .
notice 61:15, 63:16, 66:17 .
number 2:21, 4:17, 4:18, 7:2, 23:21, 59:10 .
numbers 15:21 .

.

.

**< O >** .

object 46:9 .
objection 3:3, 3:4, 3:6, 7:5, 63:13 .
objections 6:16, 23:9, 62:2 .
Obviously 6:12, 7:4, 8:25, 14:8, 17:1, 17:5, 18:13, 19:7, 22:21, 63:17, 64:15, 65:14, 65:17, 69:21, 70:7 .
occasion 13:20 .
occurring 9:11, 12:10, 67:12 .
offense 11:17, 14:16, 14:17, 18:17 .
offenses 9:17, 11:11, 19:18, 21:23, 22:2 .
offer 59:6 .
Office 1:30, 1:38, 1:43 .
Official 71:1, 71:17 .
often 60:1 .
Okay 2:20, 4:25, 5:12, 5:24, 6:23, 7:6, 7:9, 13:3, 15:10, 16:5, 20:2, 21:9, 23:20, 24:1, 46:7, 47:1, 47:18, 48:5, 48:15, 48:24, 56:17, 57:4, 60:3, 62:14, 65:12, 66:8, 66:14, 70:15 .
old 59:25 .
Once 4:12, 4:17, 4:18, 16:1, 17:9, 23:2, 51:10 .
ones 53:17 .
open 45:4 .
opinions 49:2, 49:13 .
opportunity 51:25 .
others 13:1, 52:20, 53:18, 54:6, 55:8, 55:19 .
otherwise 46:11, 47:15, 59:8 .
outlined 8:1 .
outside 4:13, 55:20, 56:7, 57:1, 68:21 .
overlaps 46:17 .
overly 14:8 .
own 9:25, 12:11, 67:12 .
owners 11:1 .

.

**< P >** .

P2 47:6 .
Page 24:10, 71:7 .
paid 15:22 .
palatable 20:25 .
part 16:2, 21:15, 23:14, 45:6, 45:19, 45:23, 48:3, 51:5, 51:12, 52:10, 53:21, 54:2, 59:4, 59:5, 59:14 .
participated 54:4 .
participation 46:6 .
particular 4:12, 6:14, 13:19, 50:16, 56:21, 56:23, 56:24 .
particularly 6:2, 19:15, 22:3, 64:25, 65:23 .
parties 2:22, 4:14, 5:3, 6:11, 7:20, 20:23, 60:16, 61:2, 62:23, 64:1, 64:11, 68:10, 70:8 .
patently 52:9 .
path 23:10, 46:15 .
Patricia 71:2, 71:16 .
pattern 53:18 .
Paul 1:29, 2:10 .
pay 16:1 .
payment 11:23, 15:14, 15:16, 20:12, 20:13, 20:16, 22:19, 23:6 .
penalties 48:3, 48:9, 48:17 .
pencil 3:20 .
people 3:14, 5:22, 6:6, 20:6, 50:5, 56:21, 58:24, 61:11, 63:25, 64:6, 67:25, 68:2 .
perception 17:20 .
period 10:5, 69:13 .
perpetrator 8:6 .
person 4:15, 9:18, 9:21, 12:18, 17:11, 51:18, 57:9, 57:10, 67:9 .
personal 54:22 .
persons 23:21, 53:24, 54:2, 54:4 .
perspective 24:2 .
pertaining 45:8 .
phone 9:7, 45:16, 45:21, 47:5, 47:10, 61:20, 61:22 .
phrase 65:2, 67:13 .
phraseology 66:24 .
pick 19:2, 69:22, 70:5 .
piece 14:9 .
piling 16:12 .
place 67:13 .
placing 13:22 .
Plaintiff 1:7 .
plan 48:9, 59:6, 69:19 .
planning 8:4, 15:25, 59:18 .

play 22:11, 54:2 .
played 64:15 .
pleadings 16:10 .
Please 2:3 .
PLLC 1:43 .
plot 15:25 .
plow 63:12 .
podium 4:3 .
point 7:20, 9:16, 11:9, 19:15, 21:22,
    22:11, 24:5, 46:5, 47:23, 49:15,
    49:22, 51:24, 52:3, 56:24,
    59:12, 62:11, 62:17, 63:16,
    65:19, 66:4, 69:6, 70:10,
    70:12 .
points 16:10, 18:20, 50:7, 53:17,
    60:19, 64:17, 69:10 .
Police 13:15 .
pool 3:18, 4:20, 70:3, 70:5 .
pools 69:25 .
Portion 24:9 .
position 16:6, 16:11, 17:7, 18:11,
    45:17, 52:13, 56:9 .
possible 23:5, 68:2, 68:22 .
possibly 11:25, 60:17 .
potential 60:4, 61:23, 67:21 .
potentially 61:3, 67:19 .
precise 23:6 .
precisely 56:4 .
precluded 58:17, 67:1 .
precluding 47:20 .
prefer 48:1, 65:19, 67:25 .
prejudice 8:12, 56:21 .
prejudicial 8:10, 8:11, 8:13, 17:6,
    21:14, 65:11 .
preliminary 3:1, 3:2, 6:24 .
preparation 8:5 .
prepare 6:12 .
prepared 3:1 .
presence 68:22 .
present 2:16, 14:13, 14:15,
    50:7 .
presentation 21:1 .
presented 12:8, 18:14, 23:5, 52:3,
    54:18, 57:17, 58:8 .
preserve 7:4 .
Presumably 58:25, 59:1 .
presume 48:16, 48:23 .
PRETRIAL 1:21, 2:21, 63:3 .
pretty 6:5 .
prevent 55:17 .

prevents 16:19 .
previous 18:14, 23:7 .
previously 17:7, 17:9, 49:24, 50:2,
    60:2, 60:6 .
primarily 61:19 .
primary 13:11, 13:15 .
primed 17:10 .
prior 16:12, 16:20, 19:11, 20:19,
    45:8, 48:25, 52:19, 53:3, 53:13,
    58:5, 60:7, 64:13 .
Probably 3:17, 5:2, 11:9, 21:6,
    48:2, 60:12 .
probative 18:8, 21:14 .
problem 14:20 .
Proceedings 1:20, 21:19, 22:13,
    70:22, 71:6 .
proceeds 20:15 .
process 4:22, 10:12, 16:23,
    47:13 .
procurement 15:14 .
produced 50:25 .
proffer 11:18 .
proffered 8:8, 8:19 .
prohibited 52:15 .
proof 54:24, 54:25, 59:6,
    59:15 .
proper 52:21, 55:8, 62:7,
    62:13 .
propose 60:17 .
proposed 6:11, 8:15, 56:7 .
prosecution 23:24, 54:10 .
prosecutorial 49:22 .
prospective 19:17, 21:17, 21:25,
    22:10 .
prove 7:15, 11:8, 16:14, 16:24,
    19:10, 19:20, 20:21, 22:7, 23:1,
    50:25 .
proven 55:7, 55:22 .
provide 47:11, 62:2, 64:6 .
provided 9:14, 9:21, 10:10, 10:24,
    22:20, 46:10, 47:5, 47:6, 49:25,
    51:9, 54:21, 55:3, 61:15,
    62:8 .
provides 14:19, 16:2 .
providing 9:17, 9:18 .
proving 45:24, 57:18 .
punishment 48:21 .
pursuant 71:5 .
pushing 3:16 .
put 6:6, 6:14, 16:21, 18:23, 18:24,

45:23, 59:6, 64:2 .
.
.
< Q > .
qualified 4:16, 4:18, 5:13,
    5:22 .
quantum 56:2, 56:4 .
question 4:9, 5:21, 6:1, 11:5, 45:9,
    46:1, 52:12, 52:15, 52:20 .
questioning 4:12, 51:6 .
questionnaire 3:20 .
questionnaires 3:25, 63:24,
    64:5 .
questions 4:6, 4:7, 4:9, 4:21, 7:24,
    8:21, 23:17, 48:11, 52:14,
    63:9 .
Quick 6:1, 6:5 .
quoted 8:11 .
.
< R > .
raise 7:11 .
raised 64:20 .
range 69:9 .
rather 64:1 .
reach 21:2, 70:15 .
reaching 55:6, 56:13 .
read 3:21, 53:21 .
reading 3:24 .
ready 68:20 .
realize 70:8 .
realizes 66:5 .
really 23:9, 16:12, 20:4, 20:10,
    23:15, 45:11, 46:24 .
Realtime 71:3 .
reason 49:14, 50:16, 56:4, 57:21,
    58:1, 58:12, 59:22, 63:9 .
reasonable 23:9, 51:25, 55:23,
    56:2, 56:3, 56:6, 57:7, 57:12,
    57:19, 59:9 .
reasons 8:7, 8:18, 15:13, 18:16,
    50:10, 56:5 .
received 9:20, 51:15 .
recess 70:21 .
record 6:15, 59:4, 62:15 .
record. 24:9 .
recorded 9:25, 10:5, 12:8 .
records 45:16, 47:10, 47:12, 47:16,
    61:14, 61:16, 61:17, 61:20,
    61:22, 61:23, 62:8, 62:12,

62:17 .
red-handed 57:9 .
redaction 66:9 .
refer 64:13, 65:8, 67:21 .
reference 67:2 .
references 58:4, 64:24 .
referencing 48:10 .
referred 66:10 .
referring 65:3, 66:20 .
refers 67:4 .
regard 54:19 .
regarding 19:16 .
Registered 71:2 .
regular 61:5 .
regulations 71:8 .
related 9:22, 10:22, 15:6,
    56:20 .
relating 47:20, 47:24, 48:9, 54:20,
    55:18, 58:18, 61:20 .
relationship 20:9, 20:10, 22:20,
    23:7 .
relative 48:24, 48:25, 49:3, 51:13,
    58:5 .
relevance 51:19 .
relevant 8:4, 8:8, 11:14, 13:7, 13:9,
    15:13, 17:14, 17:15, 17:19,
    21:13, 50:23, 55:11,
    56:23 .
reliable 8:9 .
rely 68:25 .
relying 56:10 .
repaid 66:3 .
report 9:8, 68:20 .
reported 10:3, 11:11, 11:12, 12:15,
    19:17, 21:18, 21:21, 67:10,
    67:14 .
Reporter 71:1, 71:2, 71:3,
    71:17 .
request 4:15, 6:8, 63:2 .
requested 54:13 .
requesting 58:11 .
require 14:13, 22:1, 66:9 .
residence 13:22 .
resolve 68:21 .
resolved 48:3 .
respect 4:6, 6:15, 11:20, 12:5, 12:6,
    12:10, 13:3, 20:22, 22:3, 22:18,
    46:22, 47:4, 54:17, 61:1, 63:20,
    64:20, 65:23 .
respond 52:7, 60:3 .

responded 63:8 .
response 14:12, 46:23, 63:5 .
responsibility 46:19 .
rest 16:10 .
restrained 22:4 .
restroom 69:5 .
resulting 65:2, 65:4, 65:21, 66:1, 66:7 .
retrial 60:7 .
retrials 22:16, 59:25 .
retry 14:2 .
retrying 16:20, 22:4, 22:5, 46:19 .
reviewed 7:20 .
revisit 7:7 .
rid 13:10, 14:24, 18:2, 19:25 .
rise 70:20 .
risk 8:14 .
RMR 71:16 .
road 19:8, 51:9 .
robbery 14:22, 18:1, 57:8 .
role 21:17, 22:10 .
rolling 70:4 .
room 68:24 .
rule 4:14, 55:5, 58:17, 66:8 .
ruled 65:18 .
ruling 23:13, 23:17, 58:15, 63:4 .
rulings 21:1 .
run 64:8 .
running 70:2 .
Russell 3:15, 5:12 .
RXRS 9:11, 11:1, 12:10 .
.
.
< S >.
safest 60:25 .
sanitation 22:1 .
sanitize 20:18 .
sanitized 16:18, 21:20 .
save 23:22 .
saying 14:10, 19:24, 52:9 .
says 5:12, 53:22, 54:3, 55:5, 55:9, 55:12 .
scale 57:23 .
scattered 62:10 .
scene 13:17 .
scheme 8:23, 9:3, 9:5 .
scope 57:3 .
screens 4:5 .

seal 24:5 .
seal. 24:11 .
sealed 23:20, 24:9 .
seated 2:4 .
seats 3:21 .
seeing 4:4 .
seeks 8:16 .
seem 45:10, 48:7, 61:5 .
seems 8:24, 11:14, 19:19, 20:4, 60:19, 60:24, 64:18, 66:16 .
Sekou 53:14 .
select 4:20 .
selected 3:11 .
selection 3:10 .
sense 12:4, 57:14, 68:14 .
sentence 51:10, 51:15 .
sentenced 48:13 .
separately 52:23, 54:15, 54:17, 56:14 .
serious 16:16 .
sheet 2:25, 3:10, 3:23, 4:4, 4:7, 6:10, 61:23 .
sheets 4:19 .
shooter 15:16, 15:22, 15:24, 16:1, 16:4, 20:5, 20:7, 20:14 .
shooting 45:12, 45:14 .
shot 13:17 .
shouldn't 50:9, 50:10, 53:2, 53:3, 55:24, 56:12 .
sickness 5:2 .
sides 21:3 .
significant 48:12, 48:13 .
signing 12:12 .
Silver 1:40 .
simply 7:25, 14:14 .
sit 3:21, 4:2 .
sitting 69:20 .
situation 7:14, 64:8, 66:18, 67:24 .
small 12:18 .
sold 23:4 .
solely 54:18, 54:23, 56:10 .
somebody 4:9, 52:11, 56:16 .
somehow 60:7 .
someone 18:16, 22:22, 22:24, 51:1, 64:2, 64:9, 67:2, 69:2 .
sometime 69:5, 69:8 .
somewhat 7:10, 65:1 .

somewhere 69:11 .
soon 70:17 .
sooner 64:1, 64:6 .
sorry 55:4 .
sort 6:6, 8:24, 11:5, 11:18, 16:12, 16:18, 17:8, 18:22, 19:2, 20:10, 46:14, 48:6, 57:22, 61:3, 62:10, 63:7, 64:12, 69:9 .
sorts 21:3 .
sound 5:13 .
sounds 46:20, 67:11 .
source 11:24, 15:18 .
South 1:31 .
sparked 9:8 .
speaking 10:1 .
special 70:2, 70:5 .
specific 59:12 .
specifically 6:11, 7:16, 12:11, 58:6 .
speculate 53:8, 58:3 .
Spring 1:40 .
stages 9:13 .
stand 61:10 .
stand-in 18:12 .
standard 8:9, 18:16, 48:20, 55:23, 55:25, 57:7, 57:18, 58:7 .
standing 4:3 .
stands 54:24, 70:20 .
start 10:8, 19:7 .
started 10:21, 69:4, 70:7 .
Starting 3:2 .
starts 69:3, 69:21 .
stated 18:23 .
statement 19:16 .
statements 13:24, 18:25, 63:2, 63:17 .
States 1:1, 1:5, 1:30, 2:9, 71:3, 71:9 .
stay 22:14, 58:7, 68:7, 68:15 .
staying 68:1 .
stenographically-reported 71:6 .
stenotype 1:49 .
step 4:13, 20:4 .
STEPHANIE A. GALLAGHER 1:22 .
stick 67:25, 68:6 .
stipulate 20:24 .
stipulation 21:7 .
stop 4:19 .

story 9:6, 14:14, 16:2 .
streamlined 20:25, 23:5 .
Street 1:31, 1:44 .
strength 13:8, 13:9, 14:4, 14:6, 15:6, 15:7, 17:2, 17:16, 17:18, 17:20, 48:25, 49:4, 50:19, 51:13, 51:18, 58:5 .
strict 64:2 .
strike 4:15, 6:2 .
strikes 4:13 .
strong 14:25 .
stronger 15:2, 15:8, 50:14, 50:21 .
stuff 21:8 .
subject 7:4, 48:20 .
submission 7:20 .
submissions 7:24 .
submitted 6:12, 53:17, 53:18, 60:15 .
substance 12:21, 21:7 .
substantial 16:16 .
substantially 19:9, 50:21 .
sufficiency 57:8 .
sufficient 16:14, 20:17, 49:8, 49:11, 50:25, 56:1, 56:16, 57:11 .
suggesting 14:7, 14:9, 55:14 .
suggestion 5:7 .
Suite 1:39, 1:44 .
sum 12:21, 20:13, 20:15 .
summaries 47:4 .
summarize 7:25, 12:7, 13:16 .
summarizing 10:13 .
Summary 11:5, 11:18, 18:24, 45:15, 45:16, 45:20, 46:8, 46:9, 47:4, 47:5 .
summertime 5:1 .
supplies 12:14, 12:17, 13:2 .
support 19:25 .
suppose 51:20, 65:9 .
supposed 57:16 .
.
.
< T >.
table 56:22 .
talked 5:3, 21:12, 58:10 .
tap 69:15 .
team 23:25 .
tee 63:7 .
telephonically 46:24 .

**tend** 5:2 .
**tends** 68:5 .
**Teresa** 1:37, 1:38, 2:13 .
**term** 66:19, 67:2, 67:17 .
**terms** 5:3, 5:23, 6:24, 11:10, 17:4, 20:12, 20:25, 22:4, 22:19, 23:10, 58:7, 58:13, 61:15, 64:21 .
**testify** 19:19, 45:18, 53:6, 53:13, 54:8, 63:10 .
**testimony** 10:9, 10:20, 12:19, 12:21, 13:23, 15:15, 16:3, 18:25, 45:24, 51:17, 58:18, 58:24, 59:2, 60:21, 67:21, 69:2, 69:6, 69:10 .
**texts** 47:6 .
**theft** 14:21 .
**themselves** 20:16 .
**They'll** 48:20, 58:25, 59:1, 59:24 .
**they've** 20:13 .
**thinks** 47:14 .
**though** 22:3, 22:18, 53:5 .
**Three** 5:6, 5:10, 61:22 .
**throughout** 61:7 .
**tickets** 12:13 .
**timeline** 58:23, 59:24, 60:5, 60:10, 61:2, 61:11 .
**timing** 50:22, 58:1 .
**tipped** 57:23 .
**today** 2:20, 21:1, 21:12, 47:9, 47:14, 58:11, 64:11, 68:11, 70:12 .
**together** 22:23, 56:22 .
**topic** 7:17, 17:15 .
**topics** 7:12 .
**touch** 7:15, 11:19, 15:10 .
**towards** 53:23 .
**tower** 13:21 .
**trafficking** 11:20, 15:11, 15:12, 20:3, 20:9, 22:18 .
**TRANSCRIPT** 1:20, 71:6, 71:7 .
**transcription** 1:49 .
**trials** 52:21, 59:25 .
**tried** 53:12, 56:22, 59:11, 59:19, 60:6 .
**true** 71:5 .
**trust** 22:21 .
**trusted** 20:5 .

**try** 21:8, 51:16, 56:15, 68:6 .
**trying** 19:20, 21:2, 22:5, 22:6, 23:1 .
**Tuesday** 70:5, 70:7 .
**turn** 17:12 .
**Turning** 3:9, 6:10, 11:24, 15:18 .
**two** 2:25, 5:15, 8:25, 9:17, 10:22, 12:8, 15:13, 22:20, 45:15, 49:19, 50:9, 50:17, 53:1, 53:11, 55:10, 57:25, 58:19 .
**type** 17:11, 68:10 .
**types** 17:2 .
**Typically** 3:12, 3:18, 4:6, 6:3, 68:17, 69:4, 69:6, 69:11, 69:25 .
.

**< U >.**
**U.S.** 23:25 .
**ultimately** 19:12, 19:13, 20:14, 65:25 .
**underlying** 16:25, 18:17, 46:5, 46:10, 46:11 .
**understand** 16:5, 46:16, 50:13, 51:14, 51:17, 51:19, 57:24 .
**understanding** 8:22, 21:16, 21:24, 22:9, 22:10, 70:6 .
**understood** 46:14 .
**unfair** 8:12 .
**unfairly** 8:11, 8:13 .
**unfavorable** 53:23 .
**unindicted** 54:8 .
**United** 1:1, 1:5, 1:30, 2:9, 71:3, 71:9 .
**Unless** 6:24, 7:23, 21:9, 47:14, 59:22, 63:9, 63:12 .
**unnecessarily** 65:10 .
**until** 5:21, 6:7, 23:22, 49:8, 49:19, 49:25, 50:5, 50:17, 51:8, 53:1, 55:10, 57:24, 62:18 .
**upcoming** 21:19, 22:13 .
**uses** 66:4 .
**using** 3:11, 8:11, 68:2 .
.
.
**< V >.**
**VA** 1:45 .
**vacations** 5:23 .

**various** 45:21, 58:24 .
**verdict** 54:16, 54:22, 54:25, 55:6 .
**version** 14:18, 16:18 .
**versus** 2:9, 51:18, 66:11 .
**victim** 9:5, 9:7, 9:14, 10:3, 10:5, 10:7, 10:14, 10:18, 10:21, 10:24, 11:11, 11:12, 12:15, 12:24, 14:9, 16:17, 18:22, 19:3, 19:6, 66:20, 66:21, 67:2, 67:24, 67:25, 68:3 .
**video** 47:4 .
**view** 11:13, 47:22, 48:8, 59:15, 59:24, 63:9 .
**views** 17:2 .
**voir** 2:25, 3:9, 6:10, 6:11, 6:24, 69:20 .
**vs** 1:8 .
.
.
**< W >.**
**wait** 6:3, 6:7 .
**wanted** 46:14, 63:7, 63:23, 64:11 .
**wants** 19:25, 47:25, 59:22 .
**Wayne** 1:39 .
**ways** 12:8, 14:3, 20:23, 58:21, 61:8 .
**weaker** 56:9 .
**weeds** 11:10 .
**week** 46:24 .
**weight** 47:21, 55:19 .
**WHALEN** 1:37, 1:38, 2:12, 2:13, 4:24, 5:8, 5:9, 5:11, 5:20, 6:20, 7:2, 16:8, 24:6, 51:22, 70:14 .
**whatsoever** 14:19 .
**Whether** 14:21, 18:12, 50:3, 50:24, 55:6, 55:22, 57:17, 57:20, 59:3, 61:3 .
**whistle** 66:24 .
**whistle-blower** 67:3, 67:4, 67:8, 67:18, 67:22, 68:1, 68:5, 68:7 .
**whole** 20:20 .
**will** 8:14, 10:9, 10:19, 12:19, 15:15, 15:20, 16:3, 20:7, 20:14, 23:9, 48:17, 50:20, 52:5, 53:5, 58:13, 58:23, 59:4, 60:20, 60:25, 62:23, 63:14, 63:24, 64:24,

66:10, 66:17, 68:2, 70:18 .
**willing** 24:2 .
**within** 8:17, 57:3 .
**Without** 18:17, 50:11, 54:19 .
**witness** 9:5, 10:1, 10:13, 10:19, 12:19, 12:20, 13:11, 13:23, 14:16, 16:17, 16:18, 17:21, 18:8, 18:25, 19:16, 19:17, 19:18, 21:17, 21:25, 22:11, 22:12, 51:11, 63:25, 64:3, 66:19, 67:4, 67:5, 67:21, 67:22, 70:17 .
**witnesses** 12:12, 13:21, 14:24, 14:25, 15:2, 18:1, 18:3, 19:10, 20:21, 50:7, 50:9, 50:11, 59:21, 67:1, 67:7, 67:8, 67:18 .
**word** 65:10, 66:4, 67:19, 68:1 .
**work** 5:14, 7:12, 19:2, 57:15 .
**worked** 9:12, 46:25 .
**working** 61:24 .
**worse** 65:16 .
**written** 3:20, 10:12 .
**Wutah** 65:22 .
**Wutoh** 7:3, 8:24, 8:25, 9:4, 9:12, 10:16, 10:25, 11:3, 11:13, 11:16, 13:4, 13:17, 13:22, 13:25, 15:9, 17:4, 18:7, 22:2, 22:3, 22:15, 60:24, 64:23, 65:9, 65:19, 66:3, 66:15 .
.
.
**< Y >.**
**Y.** 1:28 .
**years** 59:10, 59:25 .
**yesterday** 2:24 .
**you-all** 67:18, 70:19 .